**HAMILTON COUNTY COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| ZACH FUGMAN, *et al.* | : | Case No. A2405375 |
| | : | |
| Plaintiffs, | : | Judge_____ |
| | : | |
| v. | : | |
| | : | **MOTION FOR TEMPORARY** |
| CONSTANCE KANG, *et al.* | : | **RESTRAINING ORDER AND** |
| | : | **PRELIMINARY INJUNCTION, WITH** |
| Defendants. | : | **RULE 65(A)(2) STATEMENT OF** |
| | : | **COUNSEL** |
| | : | |
| | : | **SUPPORTED BY VERIFIED** |
| | : | **COMPLAINT** |
| | : | |
| | : | |

**EXHIBIT E**

Now come Plaintiffs, Zach Fugman and Banana Capital Partners, LLC ("BCP"), by and through undersigned counsel, and pursuant to Civil Rule 65 hereby move this Court for a temporary restraining order to prevent Defendants Constance Kang ("Kang") and Zhongyi Liu ("Liu") from interfering in any way with Mr. Fugman's operation and control over BCP and further to prevent Defendants from taking any actions on behalf of BCP. Plaintiffs also move for a preliminary injunction under Civ.R. 65(B). If Defendants are not immediately enjoined from their operation of BCP and control of BCP's finances Mr. Fugman and BCP will suffer irreparable harm. This Motion is supported by the Verified Complaint and the memorandum below.

Respectfully submitted,

*/s/ Bradley M. Gibson*
_____
Christopher P. Finney (0038998)
Bradley M. Gibson (0087109)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
 (513) 943-6650

1

(513) 943-6669 (fax)
Chris@FinneyLawFirm.com
Brad@FinneyLawFirm.com
*Attorneys for Plaintiffs*

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

Plaintiffs seek this temporary restraining order and preliminary injunction to enjoin Defendants from taking steps to further deplete BCP's assets and bar Mr. Fugman, the  majority owner of BCP, from operating BCP on the grounds that Defendants have breached the BCP Operating Agreement, violated their fiduciary duties to BCP, and are misappropriating BCP funds such that BCP is in risk of defaulting on debts and incurring significant liability in relation to its management of an apartment complex. Plaintiffs have filed a Verified Complaint contemporaneously herewith, in accordance with Civ. R. 65.

### II.    FACTS

Plaintiff Banana Capital Partners, LLC ("BCP") manages an apartment complex consisting of six buildings, each with eleven units, located at 5484 Bahama Terrace, Cincinnati, Ohio (the "Property"). (Verified Complaint, ¶¶ 11-12). BCP manages the Property on behalf of the owner, Serentiy at High Point, LLC ("Serenity"). (*Id.* at ¶ 13). BCP has three members. (*Id.* at ¶¶ 8-9). Plaintiff Zach Fugman owns a 51% membership interest in BCP, while Defendants Kang and Liu, as husband and wife, collectively own a 49% membership interest in BCP. (*Id.*)

The members of BCP entered into an Operating Agreement on May 23, 2022. (*Id.* at ¶ 10). Under Section 7.2(b) of the Operating Agreement, each member of BCP is entitled to access the company's books and records. (*Id.* at **Exhibit 1**, Section 7.2(b)).

Since August 18, 2022, Defendants have overseen the day-to-day management of the Property, including collecting rents, evicting tenants, performing maintenance, and marketing units for rent. (*Id.* at ¶ 16). Defendant Kang was responsible for maintaining the financial records related to the Property for both BCP's tax reporting purposes and for reporting the financial condition of the Property to the owner. (*Id.* at ¶ 17).

The owner of the Property, Serenity, has informed BCP that it intends to sell the Property, and that it has received several offers from potential buyers. (*Id.* at ¶ 18). Serenity's listing broker has been requesting the financial records related to the management of the Property that would allow prospective buyers to complete their due diligence before agreeing to buy the Property. (*Id.* at ¶ 19).

As a result, in February 2024, Mr. Fugman requested that Kang update and complete BCP's records so that they could be provided to prospective buyers of the Property and so that BCP could provide its accountants with documentation necessary to complete tax returns. (*Id.* at ¶ 20). From February 2024 through August 2024, Kang delayed providing a full disclosure of BCP's records and often insisted that that prospective buyers did not need all the financial records to complete their due diligence. (*Id.* at ¶ 21).

On or about August 27, 2024, after repeated requests, Kang provided incomplete financial records relating to the Property. (*Id.* at ¶ 22). Kang's delay and resistance to providing complete financial records caused great concern to Mr. Fugman, who was trying to communicate with investors in Serentiy concerning the state of the Property and a potential sale. (*Id.* at ¶ 23).

As a result, Mr. Fugman started investigating the financial information that Kang provided and information that he was able to independently access concerning the Property. (*Id.* at ¶ 24). Mr. Fugman knew that BCP should be collecting approximately $50,000.00 in rent each month

based on the number of rental units and the average rent. (*Id.* at ¶ 25). Kang was supposed to utilize the property management software platform known as ResMan to keep track of information related to tenants, income, debts, occupancy rates, delinquency and other information related to the Property. (*Id.* at ¶ 26). When Mr. Fugman reviewed the information available to him on ResMan, he saw that the Property had average occupancy rate of 96.22% in 2024. (*Id.* at ¶ 27). Despite the occupancy rate, Mr. Fugman also saw in ResMan that there was a serious delinquency in the amount of money that should have been collected from the tenants. (*Id.* at ¶ 28). In the beginning of 2024, the delinquency was typically between $10,000 and $16,000 each month. (*Id.* at ¶ 29). In August 2024 that number ballooned to $35,212.45, and as of November 2024 the delinquency amount is $52,168.51. (*Id.* at ¶¶ 30-33).

Mr. Fugman interpreted these numbers to mean either: (i) tenants are occupying the units buy are not paying rent; or (ii) Kang and Liu had been misappropriating rent payments for their personal use. (*Id.* at ¶ 34). Mr. Fugman questioned Kang about the discrepancy between the occupancy and delinquency amounts reported in ResMan. (*Id.* at ¶ 35). Kang responded that she had collected some rent payments from tenants personally via CashApp, which she claimed would be deposited into BCP's checking account from time to time. (*Id.*). Kang, however, refused to provide Mr. Fugman with her Cash App records. (*Id.* at ¶ 36).

Mr. Fugman then contacted one of the tenants showing as delinquent on the reports, who responded that he had paid his rent, and sent a screen shot from his phone showing that he paid Kang directly via Cash App. (*Id.* at ¶ 37).

Fearing that Defendants were misappropriating BCP funds, and due to Kang's inability to provide complete financial records, Mr. Fugman attempted to schedule a meeting with Kang at the Property. On November 22, 2024, Mr. Fugman and his wife emailed Kang to let her know they

would be traveling to Cincinnati from their home in Houston, Texas and specifically requested to meet with Kang at the Property to discuss reconciling income and deposits, strategic planning for 2025, and enhancing BCP's management strategy. (*Id.* at ¶ 38). Kang agreed to meet with Mr. Fugman at the Property at 2:00 p.m. on November 25, 2024. (*Id.*).

On November 25, 2024, Mr. Fugman traveled to Cincinnati from Houston, Texas, to attend the meeting at the Property with Kang. (*Id.* at ¶ 39). At 11:58 a.m., just two hours before the scheduled meeting, Kang emailed Mr. Fugman stating that she would have to reschedule the meeting because she had undergone surgery that morning. (*Id.*).

After receiving the email from Kang, Mr. Fugman entered the Property using a security code that Kang had created for the members of BCP. (*Id.* at ¶ 40). While in the office, Mr. Fugman observed stacks of unpaid bills on the desk and a letter from a lawyer threatening to sue BCP for wrongfully withholding security deposit from a tenant. (*Id.*). Kang had never informed Mr. Fugman of the unpaid bills or threat of a lawsuit. (*Id.*).

That same day, November 25, 2024, Mr. Fugman accessed the Chase Bank checking account maintained for the Property using the login credentials Kang had previously provided. (*Id.* at ¶ 41). Mr. Fugman saw that there was approximately $100,000.00 in the Chase Bank Account. (*Id.*).

The following day, November 26, 2024, Mr. Fugman returned to the Property but found that the security code he used to enter the Property the prior day no longer worked. (*Id.* at ¶ 42). Mr. Fugman then saw Liu leaving the Property and asked him why the codes had been changed. (*Id.*). Liu responded that there was no reason for Mr. Fugman to be entering the Property. (*Id.*). Liu then got into his vehicle and left. (*Id.*).

Mr. Fugman then attempted to log into the Chase Bank Account as he had the day prior but discovered that the login credentials had also been changed and was no longer able to access the company's checking account. (*Id.* at ¶ 43).

Later that night, Kang sent an email to Mr. Fugman telling him he was not allowed on the Property. (*Id.* at ¶ 44). Mr. Fugman has since attempted to contact Kang to figure out why she was locking him out of the Property and the Chase Bank Account, but Kang has refused to respond. (*Id.* at ¶ 45). She has not answered any phone calls from Mr. Fugman in November. (*Id.*).

Although Mr. Fugman is the majority owner of BCP, Kang and/or Liu are actively preventing him from accessing both the Property and the Chase Bank Account. (*Id.* at ¶ 46). By failing to account for the financial records, misappropriating corporate funds, locking Fugman out of the Property, and locking Fugman out of the checking account, Kang and Liu have breached the BCP Operating Agreement and breached fiduciary duties to BCP and Fugman. (*Id.* at ¶ 47). Moreover, their conduct poses a substantial risk of causing irreparable harm to Fugman and BCP. (*Id.* at ¶ 48).

## III.    LAW AND ARGUMENT

Civ. R. 65(A) provides, in relevant part, that "temporary restraining order may be granted without written or oral notice to the adverse party or his attorney if (1) it clearly appears from specific facts show by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, in any, which have been made to give notice and the reasons supporting his claim that notice should not be required."

6

Under Ohio law, the Court must consider and balance the following four factors in determining whether to issue a temporary restraining order or preliminary injunction:

(1) Whether Plaintiffs have a substantia likelihood or probability of success on the merits;

(2) Whether Plaintiff will suffer irreparable injury if the relief is not granted;

(3) Whether injunctive relief would unjustifiably harm third parties; and

(4) Whether the public interest would be served by issuing the injunction.

*Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div*., 673 N.E.2d 182, 184, 109 Ohio App.3d 786, 790 (Ohio App. 10 Dist.,1996), citing *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.* (1986), 24 Ohio St.3d 41, 24 OBR 83, 492 N.E.2d 814; *Goodall v. Crofton* (1877), 33 Ohio St. 271.

### A. Plaintiffs are Likely to Prevail on the Merits

Plaintiffs are likely to succeed on each of their claims. First, the facts set forth in the Verified Complaint demonstrate that Defendants have breached the BCP Operating Agreement. Section 11.4 of the Operating Agreement states that it "shall be governed by and construed in accordance with the laws of the State of Delaware." In Delaware, "the court applies the same principles that are used when construing and interpreting other contracts…Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff." *VH5 Cap., LLC v. Rabe*, 2023 Del. Ch. LEXIS 163, * 30 (internal citations omitted).[1]

Here, Mr. Fugman, Kang, and Liu all executed the Operating Agreement. As set forth in the Verified Complaint, Defendants have breached the Operating Agreement by failing to provide Mr. Fugman with access to the company books and records and by locking him out of the Property

---

[1] A copy of this decision is provided herewith.

7

and Chase Bank Account. Mr. Fugman has suffered damages by way of Defendants rendering his majority interest in BCP meaningless. Moreover, Defendants' efforts to prevent Mr. Fugman from obtaining access to BCP's financial records has allowed them to conceal their misappropriation of BCP's funds.

Plaintiffs are further likely to prevail on their claim against Defendants for breach of their fiduciary duties. Section 9.2 of the Operating Agreement provides that Defendants have a fiduciary duty to BCP to refrain from "gross negligence, bad faith or willful misconduct."

Plaintiffs have established in the Verified Complaint that Defendants have: (i) misappropriated corporate funds; (ii) refused to provide financial records; (iii) prevented the majority owner from accessing the Property; and (iv) prevented the majority owner from accessing the Chase Bank Account. These efforts, taken together, signal a clear intent by Defendants to conceal their misappropriation of corporate funds. Moreover, Plaintiffs have provided evidence that Defendants have subjected BCP to liability by failing to pay debts, failing to respond to threats of litigation, and by failing to provide information regarding the Property to the owner, Serenity, that Serenity needs in order to facilitate its desired sale of the Property. The foregoing conduct clearly constitutes "gross negligence, bad faith, or willful misconduct" that subjects BCP to significant damages.

**B. Irreparable Harm will Result if an Injunction Does Not Issue**

An irreparable injury is a harm for which no plain, adequate, or complete remedy at law exists. *Gigsmart, Inc. v. Axlehire, Inc.*, 2023-Ohio-3807, P66 (1st Dist.) "The harm threated must be irreparable, and the movant must make some showing as to why the harm cannot be remedies through compensatory damages… A demonstration of actual harm is not required, and threatened harm is sufficient to meet this requirement." *Id.* (internal citations omitted).

8

Injunctions are meant to prevent future harms, rather than as a remedy for redressing past wrongs. *Aero Fulfillment Servs., Inc. v. Tartar*, 2007-Ohio-174, ¶ 40 (1st Dist.) Ultimately, the party seeking the injunction bears the burden to present evidence establishing that, absent the injunction, it will suffer irreparable harm. *Id.* at ¶ 26.

Here, Plaintiffs have demonstrated in the Verified Complaint that Defendants are currently engaged in a concerted effort to prevent Mr. Fugman from being able to assess the condition of the Property and the financial state of BCP. If Defendants are allowed to continue to operate in the dark, collect rents in their personal capacity, fail to provide information to the owner of the Property, and fail to pay BCP's debts, there is a clear threat that Plaintiffs will suffer irreparable harm. Such harm might include, but not be limited to, any of the following: (1) BCP causing the owner, Serentiy, to default on its mortgage; (2) BCP incurring liability to taxing authorities; (3) BCP being subjected to lawsuits from Serenity; (4) BCP being subjected to lawsuits from tenants at the Property; (5) BCP being subjected to lawsuits from contractors that performed work at the Property; (6) BCP becoming bankrupt due to the misappropriation of its funds. In total, money damages cannot be calculated to redress all of the threats of harm that Plaintiffs face as a result of Defendants' efforts to conceal their activities and misappropriate BCP's funds. The only way to prevent the litany of harm that may befall Plaintiffs is to restore Mr. Fugman's right, as the majority owner of BCP, to take control of BCP's finances and operations.

**C. The Interests of Third Parties and the General Public Will Be Served by Granting Injunctive Relief.**

The issuance of an injunction in this case will greatly serve the interests of third parties and the general public. Defendants' conduct poses a significant threat to third parties, including the owner of the Property, Serenity, and the tenants of the Property. The owner has not been able to sell the Property due to Kang's failure to provide financials to prospective buyers. Serenity also

9

faces the prospect of defaulting on its mortgage if Defendants misappropriate rent money. The tenants will suffer if the Property is foreclosed upon, or if Defendants neglect to maintain the Property with BCP's funds. The issuance of an injunction will allow Plaintiffs to take control of the Property, ensure its stability, and provide a full accounting to Serentiy.

## IV. COUNSEL HAS NOTIFIED THE DEFENDANTS OF ITS REQUEST TO SEEK A TEMPORARY RESTRAINING ORDER – THE COURT SHOULD ISSUE THE ORDER *EX PARTE* IF NECESSARY.

Pursuant to Rule 65(A)(2), Plaintiff's counsel emailed Defendants a copy of the Verified Complaint and this Motion for Temporary Restraining Order and informed Defendants that Plaintiffs were requesting a hearing at 1:00 p.m. on December 3, in front of Judge Dinkelacker. Thus, Defendants have the opportunity to defend at the hearing if they so choose. If Defendants do not appear, the Court should issue the order *ex parte* as it is necessary to prevent immediate irreparable harm, as discussed above, before this Court can entertain arguments from both parties.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a Temporary Restraining Order and a Preliminary Injunction to enjoin Defendants from taking any actions on behalf of BCP, enjoin Defendants from interfering with Mr. Fugman's operation of BCP, and restore Mr. Fugman's control over BCP. A Proposed Entry granting the Temporary Restraining Order is provided herewith.

Respectfully submitted,

*/s/ Bradley M. Gibson*
_____
Christopher P. Finney (0038998)
Bradley M. Gibson (0087109)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
 (513) 943-6650

(513) 943-6669 (fax)
Chris@FinneyLawFirm.com
Brad@FinneyLawFirm.com
*Attorneys for Plaintiffs*

11

## *VH5 Cap., LLC v. Rabe*

Court of Chancery of Delaware

February 1, 2023, Submitted; June 30, 2023, Decided

C.A. No. 2020-0315-NAC

**Reporter**

2023 Del. Ch. LEXIS 163 *; 2023 WL 4305827

VH5 CAPITAL, LLC, Plaintiff, v. JEREMIAH RABE, Defendant.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Counsel: [*1]** Thomas G. Macauley, MACAULEY LLC, Wilmington, Delaware; Counsel for Plaintiff VH5 Capital, LLC.

David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; Counsel for Defendant Jeremiah Rabe.

**Judges:** COOK, V.C.

**Opinion by:** COOK

## Opinion

**POST-TRIAL MEMORANDUM OPINION**

In October 2017, a limited liability company called On Point Loyalty, LLC (or "OPL" for short) was formed to provide consulting services to companies operating airline loyalty programs. OPL had two members: Jeremiah Rabe, a longtime executive in the airline loyalty business, and VH5 Capital, LLC, an entity solely owned by a lawyer named Hugh Hill who also claimed to be the part-time general counsel of OPL. OPL operated for less than six months, never earned any profit or accumulated any assets, and was unilaterally dissolved by Rabe in April 2019 after almost a year of inactivity. From its formation to its dissolution, Rabe and VH5 never observed any corporate formalities in operating OPL.

VH5 sued Rabe for breach of contract and breach of the implied covenant of good faith and fair dealing. Both claims stem from Rabe's unilateral dissolution of OPL. This dispute boils down to whether a consistent failure to observe corporate formalities absolves a

member **[*2]** of liability for his continued failure to observe such formalities in dissolving an LLC. Perhaps unsurprisingly, I conclude that Delaware law will not countenance such policy.

Following trial, I enter judgment for VH5 on its breach of contract claim. That said, I also conclude that VH5 failed to prove damages. In lieu of evidence or a coherent theory of damages, VH5 relied on speculation and hand-waving. I therefore award nominal damages in the amount of one dollar.

## I. FACTUAL BACKGROUND

The trial record is limited. The parties introduced eighty-five joint exhibits and four deposition transcripts. In addition, VH5 introduced twenty supplemental exhibits at trial. Two fact witnesses—Hill and Rabe—testified live over the course of two days of trial. These are the facts as the court finds them after trial.[1]

### A. Parties

VH5 is a Delaware limited liability company having its principal place of business in New York, New York.[2] Hugh Hill is VH5's sole member.[3] Hill is an attorney.[4] Hill describes himself as "an attorney, a banker, and a consultant."[5] Rabe is an individual currently residing in

---

[1] Joint trial exhibits are cited as "JX __," supplemental exhibits are cited as "SX __," exhibits lodged with the Court are cited as "Lodged Ex. __," trial testimony is cited as "TT__ (Name)," and depositions are cited as "[Name] Dep. __."

[2] *VH5 Capital, LLC v. Jeremiah Rabe*, C.A. No. 2020-0315-NAC, Docket ("Dkt.") 78, Pretrial Stipulation and Order ("Pretrial Stip.") at ¶ 1.

[3] *Id.*

[4] *Id.*

[5] TT7:9-22 (Hill).

Texas.[6] Rabe has been involved in the airline industry for many years and has primarily focused [*3] on airline loyalty programs.[7]

## B. Formation of OPL

While this dispute is one between Rabe and VH5 (as well as VH5's sole owner Hill), a central character in the background is Nathaniel Felsher. At the time Rabe and Felsher met, Felsher was the head of aviation investment banking at Deutsche Bank.[8] Rabe and Felsher had a close personal and business relationship.[9] As described by Rabe on the original idea for OPL,

> [Felsher and I] had actually traveled to Europe together to explore an investment in a loyalty program of a European airline. That didn't ultimately turn into anything, but we kept on talking. We went to, like, venture conferences together. And then, in 2017, towards the beginning, is when we started thinking more about this concept of [OPL] and doing consulting.[10]

In March 2017, Rabe and Felsher prepared a PowerPoint presentation that captured their "initial brainstorms" around OPL.[11] This early presentation described OPL as "a specialized financing company that invests in travel technology with a focus on airline loyalty programs."[12]

During the summer of 2017, Rabe and Felsher began to plan the business of OPL in earnest. Rabe personally paid a freelance graphic designer to create [*4] a logo that could be used in connection with the business idea.[13] Rabe also put together more presentation discussion materials, and he and Felsher began approaching companies looking for opportunities for future business.[14] In addition, Rabe created a domain and had a website set up for use by OPL.[15]

The website set up by Rabe resulted in a portentous exchange between Rabe and Felsher. The website contained information on the business of OPL and included Felsher as part of the team, along with his picture.[16] Shortly after the website was launched, Felsher sent the following text message to Rabe: "Love the website. However can you take my profile down for the moment as I don't want a blatant conflict to arise with ac or sas."[17] Once Felsher's information was taken off the website, he sent Rabe the following text message: "Thank you. Just sent you an email. The closer we get to a deal the more important it is that there are no fingerprints for all of our all [sic] concerned but most importantly because I can get sued."[18]

In the fall of 2017, Rabe and Felsher decided that OPL should be formally created as a business entity.[19] Felsher sent a template LLC agreement that was the "proposed operating agreement, [*5] the shareholder agreement between the two of us."[20] Rabe, given his many years of experience in the airline loyalty business, would be responsible for the operations of OPL (e.g., creating presentations, bringing in business).[21] Felsher, given his experience at Deutsche Bank, would be responsible for potential investment banking services and other "CFO duties" (e.g., opening a bank account, setting up the legal entity).[22]

---

[6] Pre-Trail Stip. at ¶ 2.

[7] TT181:4-183:15 (Rabe) (stating that his first job following graduation from his MBA in 2005 was with Taca Airlines, where he eventually became the director of the loyalty program for the airline).

[8] TT13:11-17 (Hill).

[9] Rabe described Felsher as "probably one of my closest friends at that point in my life[.]" TT185:1-3 (Rabe).

[10] TT184:10-23 (Rabe).

[11] JX 2; TT186:20-187:16 (Rabe).

[12] JX 2 at 2.

[13] TT187:17-188:10 (Rabe); JX 3.

[14] TT188:18-189:7; JX 4; JX 5.

[15] TT189:8-190:8, 193:3-5 (Rabe); JX 7; Ex. 1 to JX 83.

[16] TT192:14-194:2 (Rabe); JX 7.

[17] TT193:13-194:6 (Rabe); JX 8. The terms "ac" and "sas" appear to be references to Air Canada and SAS, respectively, which may have been clients of Deutsche Bank at that time. TT193:19-194:2 (Rabe).

[18] JX 8.

[19] See TT195:22-196:5 (Rabe) ("So we had had some preliminary discussions with some potential leads or clients. And there was — I think there were NDAs that needed to be — that I had kind of received a proposal for and needed to, obviously, sign as [OPL], because up to that point we had just been, essentially, a PowerPoint. There wasn't any entity behind it.").

[20] TT194:7-18 (Rabe); JX 10.

[21] TT190:19-191:7 (Rabe).

[22] Id.

In forming OPL as a business entity, Felsher was concerned with having his "fingerprints" on any formal filings. While it was intended that Felsher would eventually become a member of OPL, he needed someone to stand in his place at OPL until he left Deutsche Bank.[23] The person that played this role was Hill, who had been close friends with Felsher for many years.[24] Hill had also provided legal services and advice to Felsher over the course of their friendship.[25] Hill was not involved in negotiating any elements of OPL's business or structure; rather he served two purposes: "[o]ne he had an operating agreement that [Rabe and Felsher] could use; and, two, [] he could sign his name on [ ] Felsher's behalf."[26]

Felsher and Rabe scrapped the operating agreement that Felsher originally **[*6]** provided. Instead, Hill, who testified that he has significant experience advising start-ups, drafted an LLC operating agreement for OPL (the "Operating Agreement").[27] The provisions of the Operating Agreement and the circumstances surrounding the formal creation of OPL show that VH5 was intended to serve only as a stand-in for Felsher.

To begin, Felsher, not Hill or VH5, made the initial $1,000 capital contribution to OPL.[28] Hill testified at trial that Felsher made the capital contribution for Hill "on behalf of some work [he] had done for [Felsher] the prior

summer."[29] Hill's testimony on this point, however, was unconvincing, and he offered no documentary evidence in support.[30]

The capital structure of OPL further supports the conclusion that VH5 was merely a temporary stand-in for Felsher. Rabe held all the Class A units of OPL, whereas VH5 held all the Class B units.[31] Only holders of Class A units were entitled to vote.[32] However, the Class B units could be converted into Class A units when transferred.[33] This convertible feature was so important that Hill, in an email to Rabe and Felsher, felt the need to emphasize it: "Basically my LLC will hold 50% economic, non-voting/control **[*7]** B shares. *Those can be converted at the point of transfer to A shares.*"[34] It is notable that this was the only specific provision of the Operating Agreement highlighted by Hill. Having carefully considered the trial testimony and other evidence, I find that the only reasonable interpretation of this email is that Hill was explaining the mechanics by which Felsher would eventually step into VH5's place and obtain voting Class A units (rather than non-voting Class B units).

OPL was officially formed on October 25, 2017, when a Certificate of Formation was filed with the Delaware Secretary of State.[35]

## C. Relevant Provisions Of The OPL Operating Agreement

---

[23] TT198:7-18 (Rabe) ("So Mr. Felsher said that he would not be able to sign the operating agreement because he was still employed at Deutsche. And I don't know exactly what his contract said at Deutsche, but he didn't feel that he would be able to — to sign it.").

[24] TT10:12-20 (Hill).

[25] TT10:21-11:1 (Hill) ("Q: Have you ever represented [Felsher] as a lawyer? A: I have provided legal services to Nat. I have never represented him in the context of a court proceeding or litigation. I've given him advice.").

[26] TT198:14-18 (Rabe).

[27] TT7:18-22, TT82:12-16 (Hill); JX 18 ("Operating Agreement"); *see also* JX 19 (email from Hill to Rabe and Felsher attaching a draft of the Operating Agreement). As already noted, Hill is an attorney and has regularly represented Felsher. In addition, VH5, the entity solely owned by Hill, was the entity that served as a stand-in for Felsher. It is unclear whether, in drafting the Operating Agreement, Hill was entirely forthcoming with Rabe about his prior dealings with Felsher.

[28] JX 27.

---

[29] TT18:7-10 (Hill).

[30] *See, e.g.,* TT86:18-23 (Hill) ("Q: Do you recall if there [were] any texts or emails regarding this agreement between you and Mr. Felsher for him to pay the $1,000 on your behalf? A: No.").

[31] Operating Agreement, Sch. A.

[32] *See* Operating Agreement § 1.1 ("'Class A Units' means units of voting Membership Interest . . . . 'Class B Units' means units of redeemable, non-voting, transferable Membership Interest[.]").

[33] *See* Operating Agreement § 11.1(b)(i) ("*Optional Conversion.* Any Class B Units transferred in accordance with this Section 11 may be converted, at the option of the Transferee, into Class A Units of equivalent to the Proportionate Interest of the Class B Units subject to Transfer. Such conversion shall require the express written consent of all Holders of Class A Units.") (emphasis in original).

[34] JX 19 (emphasis added).

[35] JX 15.

Rabe, VH5, and Hill never observed any of the formalities or procedures set forth in the Operating Agreement in conducting the business of OPL. Nonetheless, as this is ostensibly an action for breach of contract, I pause to set forth some of the relevant provisions of the Operating Agreement.

Article Four of the Operating Agreement sets forth the authority of OPL's board of directors (the "Board"), the composition of the Board, and the procedures for Board meetings. As a general matter, OPL's Board was responsible for **[*8]** managing OPL, and Board approval was required for any sale or disposition of all of OPL's assets:

> Section 4.1 <u>Authority of the Board</u>.
> (a) Except as otherwise provided in this Agreement, the business and affairs of the Company shall be controlled, directed and managed exclusively by [the Board]. . . .
> (b) Without limiting the generality of the foregoing Section 4.1(a), no act shall be taken, sum expended, decision made or obligation incurred by the Company or any Member or any officer, including any Executive Officer, or any affiliate of any of the foregoing with respect to any matter within the scope of the following decisions (collectively the "Major Decisions"), unless such Major Decision has been Approved[36] by the Board:
>
>> (i) Agreeing to sell or otherwise dispose of all or substantially all of the operating assets of the Company[.]
>
> (c) Unless specifically provided otherwise herein, whenever the Board is entitled to vote on any matter or exercise any power under this Agreement, such matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent of more than Fifty

Percent (50%) of the Directors with each Director having one vote. . . .

> (d) Notwithstanding **[*9]** the grant of authority to the Board in this Article Four, the Board shall have no authority and shall not take, or cause the Company to take, any action which requires for its authorization and/or implementation, (i) the Approval or Consent of the Class A Members under this Agreement, or (ii) the vote, Approval, or Consent of Class A Members pursuant to the Act.[37]

Section 4.2 of the Operating Agreement sets forth the composition of the Board and provides as follows:

> The Board shall be composed of a minimum of three (3) Directors which shall consist initially of Jeremiah Rabe, Hugh Hill, and one Director mutually agreed upon by the Class A and Class B Members. The Board shall be elected and removed by the majority of the Members pursuant to the terms of this Agreement. At all times, a minimum of one (1) of the Directors elected by the Members must also be a Class A Member. The number of Directors constituting the entire Board may be increased or decreased from time to time by the Approval of the Class A Members.[38]

Notably, at no point during OPL's short existence was a third Director appointed.[39]

Also relevant **[*10]** to the composition of the Board is Section 4.8, which states that "[a]ny Director may be removed from the Board with or without cause by the resolution of the Members acting at a meeting or through written Consent in accordance with the terms of this Agreement."[40]

The final provision from Article Four relevant to this dispute is Section 4.7, which provides in relevant part as follows:

> 4.7 <u>Exclusivity of Duty to Company</u>. Except as otherwise provided herein or in any other agreement relating to the Company, no Director shall be required to manage the Company as his or her sole and exclusive function and any such Director may have other business interests and may engage in other activities in addition to those

---

[36] "The phrases '<u>Approved by</u>,' '<u>Approval of</u>,' '<u>Consent of</u>,' '<u>Deemed by</u>,' '<u>Determined by</u>,' or any equivalent, each mean, with respect to the Board, approval or consent as set forth in <u>Section 4.1(c)</u> hereof, and, with respect to the Members, approval or consent as set forth in <u>Section 6.8</u> hereof." Operating Agreement § 1.1. The reference to Section 6.8 appears to be a typo as the voting requirements for Class A members are set forth in Section 6.9, not Section 6.8. Under Section 6.9, a "matter shall be considered approved or consented to upon the receipt of the affirmative approval or consent, either in writing or at a meeting, of Class A Members holding more than Fifty percent (50%) of the Class A Units then issued and outstanding which are entitled to vote." *Id.* § 6.9.

[37] Operating Agreement § 4.1.

[38] *Id.* § 4.2.

[39] TT21:18-23:4 (Hill).

[40] Operating Agreement § 4.8.

relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other activities or to the income or proceeds derived therefrom. Directors shall not incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture.[41]

In short, neither Rabe nor Hill, as Directors of OPL, were required to devote their sole efforts to OPL and neither was required to share the **[*11]** income they derived from other activities with the other.

The next article relevant to this dispute is Article Six, which contains provisions concerning the Class A and Class B members. Section 6.2 sets forth the powers of Class A members and provides in relevant part that "the Class A Members shall have the right to elect and remove any Director at a meeting called for such purpose."[42] In addition, Article Six sets forth certain actions that specifically require the approval of the Class A members:

> Section 6.3 Actions Requiring Approval of the Class A Members.
> (a) The following actions and decisions require, or may be taken or made by, Approval of the Class A Members:
>
> > (1) Election and removal of directors of, or increasing or decreasing the size of, the Board, pursuant to Section 4.2;
> > . . .
> >
> > (5) Determination to dissolve, wind up and liquidate the Company, pursuant to Section 9.2(a);
> >
> > (6) Determination of assets to be sold under liquidation, pursuant to Section 9.4[.][43]

Article Nine of the Operating Agreement elaborates on the procedures for liquidation of the Company and provides in relevant part as follows:

> Section 9.2 Events Causing Dissolution. The Company shall be dissolved and its affairs **[*12]** shall be wound up upon the occurrence of any of the following events:

(a) at any time by a determination of the Board and the Approval of the Class A Members to dissolve, wind up and liquidate the Company; [or]
(b) at any time by written unanimous consent of the Class B Members delivered to the Company[.][44]

Reading Sections 4.1, 6.3, and 9.2 together provides that a dissolution and liquidation of OPL required approval of both the Board (i.e., Hill and Rabe) and the Class A members (i.e., Rabe).

## D. OPL Operates For Less Than A Year With Minimal Success

OPL was a consulting business where "the idea, at least, was to try to, you know, bill out people's time at a higher rate than what it was costing to pay the consultants that were doing the work."[45] In connection with this business model, OPL entered into agreements with freelance consultants.[46] The agreements that OPL entered into with the freelance consultants could be terminated for convenience on 30 days' written notice.[47] Given this business model, the vast majority of the revenue that OPL generated was paid out to the freelance consultants with which OPL contracted. While Rabe spent significant time working at OPL through May 2018, **[*13]** Hill, who claimed to be the "part-time general counsel" of OPL, did not do any work for OPL after its organization.[48]

Over the course of its existence, OPL had a total of

---

[41] Id. § 4.7.

[42] Id. § 6.2.

[43] Id. § 6.3.

---

[44] Id. § 9.2.

[45] TT183:13-184:9 (Rabe).

[46] TT207:9-208:2 (Rabe).

[47] TT208:3-9 (Rabe); JX 12. The agreements that OPL entered into with the various freelance consultants did contain an exclusivity provision, which stated that "OPL and its affiliated entities . . . shall have a right of first refusal on all projects and investment opportunities originated by you that you present to OPL." JX 12. Rabe testified that he "didn't pay much attention to this clause, like in practice" because "[a]ll the consultants had other things that they were working on." TT340:9-12 (Rabe).

[48] TT89:18-90:18 (Hill) ("Q: And what did you do as part-time general counsel? A: Well, I wrote the operating agreement. I established a company. I advised on a number of contracts. I helped establish the banking relationship for OPL. And then it was a very short window there, six months, and I was on standby for what I thought was going to be a lot more work as we grew the business.").

three clients.[49] The first client, Enjoy Gestion Limitada ("Enjoy"), was a client that Rabe brought into OPL based on his prior work with them.[50] Enjoy generated total revenue of $81,801.63 for OPL, and OPL incurred costs of $74,030.51 related to employing independent consultants to handle the work with Enjoy, resulting in a gross profit of $7,771.12.[51]

The second client was brought in by Evert de Boer, an independent consultant that signed an agreement with OPL in early October 2017 to provide consulting services.[52] Rabe and de Boer knew and had worked with each other prior to the formation of OPL.[53] De Boer had his own consulting business, FFP Investment and Advisory Pte Ltd ("FFP"), that was based in Singapore and also worked in the airline loyalty space.[54] De Boer, through FFP, brought in Hawaiian Airlines based on de Boer's preexisting relationship with Hawaiian Airlines.[55] The main reason that de Boer worked with OPL on Hawaiian Airlines was because Hawaiian Airlines wanted to enter the relevant agreement with a U.S. entity.[56] **[*14]** Hawaiian Airlines generated total revenue for OPL of $66,146.48, and OPL paid de Boer $65,646.48, resulting in a gross profit of $500.[57]

Based on the evidence presented at trial, it seems that the only client that anyone brought in during OPL's formal legal existence was Ortelius Advisors.[58] OPL billed Ortelius Advisors a total of $500 for a one-hour consultation, $250 of which was paid to an OPL consultant.[59]

Added up, OPL earned a total gross profit of $8,521.12. OPL incurred insurance, administrative and travel expenses totaling $16,384.66, resulting in a net loss of

$7,863.54.[60] The only assets OPL ever had during its existence were a small amount of cash and accounts receivable, which ultimately went to cover expenses.[61] Other than these assets, OPL had neither tangible assets nor intangible assets, as Rabe never transferred the name, logo, or website he created prior to OPL's formal existence.[62]

Despite OPL's lack of actual success, VH5 and Hill insist that OPL had both a significant asset in the form of a report on the top 100 airline loyalty programs (the "Market Report") and, purportedly, a pipeline of contracts worth almost $250,000.[63] Rabe prepared the Market Report and published **[*15]** it on the OPL website.[64] The Market Report generated some inquiries, though none of the inquiries ever resulted in either revenue or a formal consulting contract.[65]

### E. Aimia Recruits Rabe To Become CEO And De Boer Forms OPL Singapore

In February 2018, Rabe was in discussions with a Canadian investment firm, Mittleman Brothers LLC, to join the board of directors of Aimia.[66] Aimia's primary business line was called Aeroplan, which was Air Canada's frequent flier program.[67] At the time of the February 2018 discussions, Mittleman Brothers was the largest shareholder of Aimia and was running an activist campaign to replace the Aimia board of directors.[68] Mittleman Brothers is controlled by two individuals: Christopher Mittleman and Phil Mittleman. In addition to a position as a director, Christopher Mittleman sought to

---

[49] TT208:10-15 (Rabe).

[50] TT209:11-210:8 (Rabe).

[51] JX 84.

[52] JX 12.

[53] TT210:12-211:18 (Rabe).

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] JX 84.

[58] TT208:21-209:10 (Rabe).

[59] *Id.*

[60] JX 84. Rabe provided a detailed accounting of the flow of payments from clients to OPL and then from OPL to consultants. *See* TT227:2-237:22 (Rabe); JX 35; JX 53; JX 54; JX 84.

[61] TT212:9-19 (Rabe).

[62] TT188:3-17, 224:18-225:17 (Rabe).

[63] Dkt. 99 ("Pl.'s OB") at 6-7; *see infra* Section I.E. for a discussion of the purported "pipeline" of OPL clients.

[64] TT269:12-271:5 (Rabe).

[65] TT274:18-277:20 (Rabe); *see also* SX 7; SX 10; SX 12; SX 13; SX 14 (various inquiries from the OPL website asking questions about the Market Report).

[66] TT213:8-214:7, 288:6-290:23 (Rabe); JX 29.

[67] TT287:3-14 (Rabe).

[68] TT213:8-24 (Rabe); JX 29.

convince Rabe to join as the CEO of Aimia.[69] As part of Christopher Mittleman's pitch to Rabe to become CEO of Aimia, he stated that "if Aimia acquiring [OPL] would make it easier, and the economic terms reasonable, then doing an 'acquihire' to get a great CEO would also not be unprecedented and something I would consider."[70] At this point, however, Mittleman Brothers was **[*16]** only a large investor, and Christopher Mittleman was not acting on behalf of Aimia.[71]

Aimia eventually made Rabe an offer to become CEO. In early May 2018, Rabe spoke with Bill McEwan, who was the head of Aimia's board HR committee, about joining as CEO.[72] On May 4, 2018, Aimia's chief talent officer sent Rabe a term sheet to join as CEO and copied McEwan and another director.[73] Under the term sheet, Rabe would receive a signing bonus of Can$1 million and total target annual compensation of Can$3.375 million, as well as an annual perquisite of Can$70,000.[74] It appears that this term sheet reflected Rabe's actual compensation when he eventually joined as CEO of Aimia.

Rabe testified that neither Christopher nor Phil Mittleman was involved in the negotiation of Rabe's compensation as CEO of Aimia.[75] Counsel for VH5, however, pressed Rabe on this point during cross-examination and noted that Phil Mittleman, in a deposition for a separate lawsuit against Rabe related to his time at Aimia, stated that he attributed significant value to OPL.[76]

There are multiple problems, however, with VH5's reliance on Phil Mittleman's deposition testimony.[77] First, as already noted, Phil Mittleman was involved in the initial **[*17]** outreach to Rabe, but not the actual back-and-forth regarding negotiation of Rabe's compensation. Also, OPL is not mentioned at all in Rabe's term sheet with Aimia. Even beyond this, Phil Mittleman acknowledged in his deposition that he, his brother Christopher, Aimia, and Rabe all believed at the time of the negotiations in 2018 that Rabe would need to divest himself of an options package for a company with which Rabe previously worked called LifeMiles.[78] Most notably, in 2018, Rabe's LifeMiles options were worth approximately $4.5 million.[79] Thus, far from attributing significant value to OPL, the more reasonable explanation is that his compensation package reflected the parties' expectation that Rabe would take a significant haircut on his LifeMiles options if he joined Aimia.

Rabe joined Aimia in May 2018. Contemporaneous with joining Aimia, Rabe emailed Hill about divesting himself from OPL.[80] In this email, Rabe stated that "I am joining a new company and as part of my agreement with my employer I need to divest my interest in [OPL]."[81] Rabe asked Hill to "draft a very simple agreement to sell the business to Evert de Boer."[82] The following day, Hill responded "[o]f course Jeremy," and **[*18]** the two had

---

[77] I note that the parties have asserted no objection to my consideration of the deposition transcript under evidentiary rules. In any event, I do not rely on the testimony for reasons I describe herein.

[78] Phil Dep. 37:3-38:11 ("I went back to Bill McEwan. I said there is [*sic*] two issues. There is [OPL] and there is his stake in LifeMiles. Sounds like we could buy [OPL] to get rid of that conflict and have it in-house, and I don't know what the situation is with LifeMiles. I asked Jeremy to see if he could keep the options, and Bill's response was 'Absolutely not. He cannot maintain the LifeMiles stake. It's a humongous conflict of interest and he has to divest himself of [OPL] one way or another.'").

[79] TT376:12-20 (Rabe); Phil Dep. 186:22-187:20. Apparently, Rabe did not ultimately need to give up his LifeMiles options. TT376:1-11 (Rabe). VH5 seems to suggest that this means the parties knew Rabe would not need to give up his LifeMiles options when negotiating Rabe's Aimia compensation package. VH5 failed to develop sufficient evidence to support its speculation at trial, however.

[80] TT217:7-218:5 (Rabe); JX 40.

[81] JX 40.

[82] *Id.*

---

[69] TT291:18-293:13 (Rabe); JX 29.

[70] JX 29.

[71] TT292:5-10 (Rabe).

[72] TT215:1-7, 368:24-369:1 (Rabe); JX 36.

[73] TT214:8-215:7 (Rabe); JX 36.

[74] TT285:11-286:14 (Rabe); JX 36. "Can$" refers to Canadian dollars. "$" without the prefix "Can" refers to U.S. dollars. Rabe's target annual compensation consisted of the following: an annual base salary of Can$750,000; a short-term incentive program with a target of 100% base salary; and a long-term incentive program with a target of 250% base salary. TT285:11-286:14 (Rabe); JX 36.

[75] TT215:8-11 (Rabe).

[76] TT369:12-371:5 (Rabe); Lodged Ex. C ("Phil Mittleman Dep.") 155:8-156:11.

a call that day.[83] During the call, Rabe informed Hill that his interest in OPL would be transferred to de Boer for zero consideration, which Hill agreed to, according to Rabe.[84] Rabe's initial email noted that Felsher was aware of this plan—Rabe testified that the reason for this was that he considered Felsher to be the other owner of OPL even though the equity was nominally owned by VH5.[85]

Hill never actually prepared the agreement to transfer Rabe's interest in OPL to de Boer.[86] After the initial conversation, Hill did not reach out to Rabe, and Rabe followed up on the status of the transfer agreement on May 22.[87] After discussions between Rabe and de Boer, however, they determined that it would be easier to simply shut down OPL and transfer the assets to de Boer.[88] On May 24, 2018, Rabe informed Hill of the plan to shut down OPL and asked Hill to pause any further work on the transfer agreement.[89] Notably, Hill did not respond to Rabe's May 22 or May 24 emails—not through email, text, or phone call.[90]

Consistent with his May 24 email, de Boer formed a new entity named On Point Loyalty Singapore Pte Ltd. ("OPL Singapore").[91] Rabe subsequently transferred to de Boer the **[*19]** login information for OPL's PR NewsWire account, a recruiting site that Rabe used to find consultants, and the "onpointloyalty.com" domain that Rabe had registered prior to OPL's formal existence.[92] Rabe has not been involved with OPL Singapore.[93] After de Boer formed OPL Singapore, Rabe continued to receive payments to OPL's bank account for work that OPL had performed while Rabe was still involved in OPL, and Rabe made payments to consultants that had worked on those projects for OPL.[94]

At trial and in its briefing, VH5 focused on an April 28,

---

[83] TT219:6-16 (Rabe); JX 40.

[84] TT219:17-220:2 (Rabe).

[85] TT220:7-11 (Rabe); JX 40.

[86] TT26:8-24 (Hill).

[87] TT222:9-223:1 (Rabe).

[88] TT223:2-224:9 (Rabe); see also JX 51 (email from de Boer stating that his accountant said "the best way is to start a clean company in Singapore (On Point Loyalty Ltd), and then do a simple asset transfer deal from OPL LLC and close that down").

[89] JX 51.

[90] TT240:12-18 (Rabe) ("Q: Now, between May 8, 2018, and January 16, 2019, had you heard anything from Mr. Hill? A: No. Q: When I say heard from, do you recall getting any calls from Mr. Hill? A: No. I didn't get any calls from Mr. Hill. No emails, nothing."). Hill claims that he "put in a couple of phone calls" after Rabe's May 24 email and that Rabe did not respond to these calls. TT28:1-15 (Hill). Having viewed Hill's testimony during trial, and in the overall context of the evidence, I find that Hill's testimony lacks sufficient credibility on this point. When asked on cross-examination whether he attempted to get any phone records to corroborate this assertion, Hill testified that "I don't have records that far back[,] I can't do that." TT63:7-9 (Hill). In a different context, this response could be perfectly sensible. Hill's assertion here, however, that I must just take his word for it reflects a concerning pattern—namely, the all-too-convenient absence of contemporaneous documents. See, e.g., TT68:20-69:4 (Hill)

("Q: So [Felsher] sent you something. Did you produce that email in your production? A: I honestly don't know. My Gmail account is my personal account, and it's full. So I periodically purge large attachments from it. So if I couldn't have found it, it was probably because of that, if I didn't produce it."); TT117:4-11 (Hill) ("Q: But you didn't produce those notes in this litigation? A: I — I don't keep records like that, sir. If I did, I would have produced them."); TT117:18-22 (Hill) ("Q: Have you produced any [evidence] that [you] started the agreement? A: No. The computer that I was working on at the time was property of Enclave Capital. And when it shut down, I didn't have access to it anymore."); TT127:5-20 (Hill) (stating that he refused to produce certain communications with Felsher on the basis of privilege even though counsel for VH5 never prepared a privilege log). Hill is an attorney who should understand the importance of maintaining documents relevant to a business relationship, particularly one that appeared headed toward litigation as early as 2019. The excuses for the lack of expected contemporaneous documents, proffered one after another, chipped away at Hill's credibility at trial. And this is to say nothing of the substance of Hill's testimony, which I address throughout.

[91] TT224:13-17 (Rabe); JX 79.

[92] TT224:21-225:4 (Rabe).

[93] TT259:18-260:5 (Rabe).

[94] Compare JX 53 ($46,103.53 invoice to Enjoy dated June 9, 2018, for "Phase 2 Project Completion"), with JX 54 (Rabe's bank account statement reflecting receipt of payment for this invoice on July 13, 2018, and payments to consultants that had worked on this project totaling $45,405.53). The bank account in question is in the name of "Orange Flix Inc." which Rabe testified was an entity that he had created for freelance consulting work and that he continued using for OPL. TT227:6-15 (Rabe). The fact that OPL did not even have its own bank account further supports the conclusion that it was never a particularly formalized entity.

2018, email from Rabe to Aimia's chief talent officer.[95] In the email, Rabe set forth certain purported financial information of OPL.[96] Rabe stated that OPL had two projects in process with "total revenue in the pipeline [of] $248,394."[97] Rabe also stated in the email that there were "a number of conversations in progress with other airlines around the world which may turn into potential consulting or investment opportunities."[98] VH5 highlights that OPL Singapore appears to have continued working with certain of the companies included in the "pipeline" after Rabe joined Aimia.[99]

Considered in the context of the evidence presented at trial, **[*20]** I find it very significant that, at the time Rabe sent his email, he was auditioning for Aimia's CEO position and the compensation that would come with it. While I believe that, if Rabe had continued working on OPL, it might well have achieved significant revenues at some point, the evidence presented at trial suggests that the numbers described above had little actual substance. In addition, the projections are for revenue, not profits. As already described, OPL's business model involved money coming in the door in the form of revenue and then mostly going promptly back out the door to pay the freelance consultants who did the work.[100]

In any event, VH5 contends that any revenue that OPL Singapore earned from these clients should properly be viewed as revenue belonging to and forgone by OPL.[101] I do not find VH5's focus on these OPL Singapore clients compelling. While Rabe continued to be copied on certain correspondence through the summer of 2018 for these clients, none of the documents provided at trial indicate that Rabe actually did any work on behalf of these clients.[102] In addition, VH5 did not offer any

evidence that OPL signed engagement letters with any of these companies or received **[*21]** any revenue.

At best, the very limited evidence concerning post-May 2018 matters presented by VH5 suggests OPL Singapore may have done some limited work for one or more entities, but it is not at all clear whether such work was material or even paid. In other words, while the limited evidence suggests that OPL Singapore did some sort of unknown work for a handful of entities after Rabe left, the evidence presented is largely just a peek at some meet-and-greets that might, or might not, have panned out and a handful of scattered follow-on emails. Following trial, I have no confidence that OPL Singapore was compensated in any material way for what seems to have been essentially a one-man-band consulting outfit for air miles.

## F. Rabe's Relationship With Felsher Deteriorates

After Rabe joined Aimia in May 2018, he introduced Felsher to Phil Mittleman, who was very impressed with Felsher and encouraged the Aimia board to recruit him to join the company.[103] Aimia hired Felsher in August 2018 to be its president and chief strategy officer.[104] But Felsher's tenure at Aimia was short-lived. Aimia terminated Felsher approximately three months later for reasons not disclosed at trial.[105] Rabe testified **[*22]** that Felsher was very upset with Rabe over this termination and, importantly, that it was devastating to their personal and professional relationship.[106]

Significantly, on the same day that Aimia terminated Felsher, Felsher contacted Hill for legal assistance.[107] Felsher then sued Aimia on January 29, 2019, in the

---

[95] JX 35.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] The clients were Aegean Airlines, Kenya Airways, and Singapore Airlines. Pl.'s OB at 18-19.

[100] Indeed, as explained above, OPL ended its short existence with a net loss.

[101] Pl.'s OB at 15-20.

[102] *See, e.g.,* SX 1 (email from an employee of Aegean Airlines to Rabe complaining about work by OPL Singapore, which

---

Rabe forwarded to de Boer); SX 2 (email from de Boer updating Rabe on current work that de Boer was doing with Aegean Airlines and other potential clients); SX 14 (February 2019 email from de Boer to Rabe where de Boer states that he would "tell [Rabe] anecdotes about Kenya Airways"); JX 44 (email exchange between January 2018 and May 2018 where de Boer pitched Singapore Airlines on consulting work with Rabe copied; final email reflects de Boer updating another OPL consultant on Rabe's departure from OPL).

[103] TT238:18-239:11 (Rabe).

[104] TT239:12-17 (Rabe).

[105] TT239:18-20 (Rabe).

[106] TT239:24-240:11 (Rabe).

[107] TT105:16-106:4 (Hill).

Superior Court of Justice in Ontario, Canada.[108] Although Hill did not act as Felsher's litigation counsel, Hill provided other legal services to Felsher in connection with his termination from Aimia through spring 2020.[109] Felsher and Aimia ultimately settled Felsher's lawsuit in mid-February 2020.[110]

On January 16, 2019, approximately two weeks before Felsher filed his lawsuit against Aimia, Hill sent Rabe a short, out-of-the-blue email asking about the "year-end numbers for [OPL]" and stating "[a]s you may recall, VH5 is the 50% owner and is therefore entitled to 50% of such profits (or losses)."[111] Absent from Hill's January 2019 email is any reference to Rabe's May 24, 2018, email to Hill, where Rabe informed Hill of his plan to close down OPL and transfer the assets to de Boer. Rabe testified that he was "alarmed" and, as explained by Rabe, his alarm seemed warranted:

> So Hill was representing [*23] Felsher, who was recently terminated by Aimia. I was the CEO of Aimia at the time. There were negotiations going on at that time where Hill was representing Felsher in those negotiations. A lawsuit was filed a week or two after this email, so a lawsuit was impending. And so it was surprising to me that he didn't disclose that conflict of interest, that he was getting a lot of money from Felsher to represent him, a lot more than anything that he had been involved with at [OPL].[112]

Rabe forwarded Hill's email to Aimia's internal and external counsel, who drafted Rabe's response, which he sent on January 24, 2019.[113] This response stated that he did not have "any clarity on year-end numbers" and noted that, "[a]s you know, the company has not been active since I took on the role as CEO at Aimia in May."[114]

Rabe then reached out to an accountant to assist with preparing OPL's 2018 tax return.[115] Consistent with the other financials produced by Rabe, this tax return showed gross receipts of $148,448.[116] The return showed total deductions of $149,720, for a loss of $1,272.[117] In addition, the return listed VH5 and Rabe as each owning 50% of OPL.[118] Finally, VH5 and Hugh Hill were listed as the tax representative [*24] for OPL.[119]

On February 21, 2019, Rabe sent Hill OPL's tax return, and on March 4, 2019, Rabe sent Hill OPL's balance sheet, profit and loss statement, and other financial information.[120] The tax return and financial statements were prepared by a certified public accountant ("CPA") and consistently showed that OPL had a net loss in 2018.[121] On March 7, 2019, Hill sent Rabe the following email:

> Jeremy, a number of significant concerns based on the attached. My accountants need to know. First, is OPL still an operating business? I sent you the

---

[108] JX 64.

[109] TT106:5-109:24 (Hill). Hill was evasive on this point at trial. He initially testified that he stopped providing legal advice to Felsher in connection with his termination from Aimia at the end of January 2019. TT106:5-107:19 (Hill). However, he shortly thereafter acknowledged that he provided Felsher legal advice in connection with a related countersuit brought against Felsher in New York state court a few months later. TT106:20-107:6 (Hill). And upon additional cross-examination, Hill finally acknowledged that he had provided Felsher with legal advice up through either February or March 2020, which is around the time that Felsher settled his lawsuit against Aimia. TT109:5-24 (Hill).

[110] TT111:3-7 (Hill).

[111] JX 61.

[112] TT248:13-249:2 (Rabe). Based on the testimony at trial and evidence put forth, it is not entirely clear at what point Rabe became aware that Hill was advising Felsher in connection with Felsher's litigation against Aimia. Upon receiving the email, Rabe immediately sent it to Aimia's internal and external counsel because he was "surprise[ed] to see . . . an

email from opposing counsel that didn't copy my lawyers or disclose what his relationship — his conflict relative to [OPL]." TT247:20-249:2 (Rabe). Aimia's internal and external counsel drafted the response that Rabe ultimately sent in response to Hill's initial email. TT249:3-15 (Rabe). The most that I can conclude from the testimony at trial is that Rabe was aware that Hill regularly provided Felsher with legal advice, though Rabe was not fully aware of the extent to which Hill was advising Felsher in connection with his litigation against Aimia.

[113] TT249:7-15 (Rabe).

[114] JX 61.

[115] JX 66.

[116] JX 65.

[117] Id.

[118] Id.

[119] Id.

[120] JX 62; JX 63; JX 65; JX 67.

[121] TT354:6-10 (Rabe); JX 62; JX 63; JX 65; JX 66; JX 67.

google results of the search mentioning Mr. de Boer. What is going on? Do I need to get my lawyers involved? Does you [*sic*] current employer, Aimia, know about this? Should I call them?[122] Rabe did not respond to this email, but Hill's threats to "get his lawyers involved" and contact Aimia foreshadowed actions that Hill and Felsher would soon take to pressure Rabe in retaliation for Felsher's termination.

## G. Rabe Formally Dissolves OPL

On April 8, 2019, Rabe formally dissolved OPL.[123] The dissolution and final franchise tax payment cost $1,020.[124] Rabe testified that this amount exceeded what was in OPL's bank account at the time, so he paid the remaining balance **[*25]** out of his personal funds.[125] Rabe contends that he had received advice from counsel that VH5 was not a member of OPL.[126] Based on this, Rabe "formally resolved, as a sole Class A Member and only unconflicted member of the Board of Directors of OPL . . . with the power to remove other directors and decrease the number of people who sit on the Board, to dissolve OPL and file a Certificate of Cancellation."[127] There is no written Board resolution or consent supporting this purported resolution by Rabe.[128] In addition, Rabe did not provide any contemporaneous notice to VH5 of the formal dissolution of OPL or of any Board action or meeting related to such dissolution.[129]

## H. Rabe Is Terminated From Aimia And Litigation Ensues

Rabe was terminated by Aimia on April 28, 2020.[130] On the exact same day that Rabe was terminated from Aimia, VH5 filed its complaint against Rabe.[131] Originally, Rabe was terminated without cause.[132] However, Phil Mittleman testified in his deposition that Felsher provided him with a copy of the complaint and that Felsher made certain allegations concerning Rabe's conduct.[133] Based on these allegations and an investigation conducted by Phil Mittleman, Rabe's termination was turned into one for **[*26]** cause.[134] The impact of the change was that Rabe was no longer entitled to a severance package worth millions of dollars.[135]

On November 12, 2020, Rabe sued Aimia, asserting claims related to his termination for cause.[136] That litigation appears to be ongoing.

## I. Procedural History

I pause to note some aspects of the procedural history concerning VH5's litigation of this action. Although I ultimately make no finding on this, these tactics bolster my concern that this litigation was brought by VH5 at the behest of Felsher to harass Rabe and damage his reputation after their falling out.

First, in its amended complaint, VH5 brought claims for fraud (Count I), breach of contract (Count II), and breach of the implied covenant of good faith and fair dealing (the "implied covenant") (Count III).[137] Two weeks before trial, VH5 dropped its fraud claim via a footnote in its motion to strike Rabe's affirmative defenses.[138] Fraud is a serious allegation. VH5's allegation of fraud hung over Rabe for over two years and undoubtedly had an impact on Rabe's personal and professional life. VH5's tactic in maintaining its fraud claim but then dropping it—via a footnote—on the eve of trial when put to its proof is concerning. **[*27]**

Second, during the pre-trial conference, VH5's counsel acknowledged that it was apparently unable to come up

---

[122] JX 67.

[123] TT251:6-13 (Rabe); JX 71.

[124] TT251:14-18 (Rabe); JX 71.

[125] TT251:14-18 (Rabe).

[126] TT250:18-251:5 (Rabe).

[127] JX 83 ¶ 8.

[128] TT352:23-353:11 (Rabe).

[129] TT353:12-354:5 (Rabe).

[130] TT254:19-22 (Rabe).

---

[131] Dkt. 1.

[132] TT256:8-10 (Rabe).

[133] TT256:21-257:4 (Rabe).

[134] *Id.*

[135] TT256:11-20 (Rabe).

[136] JX 78.

[137] Dkt. 25 ("Amended Compl.") ¶¶ 39-60.

[138] Dkt. 63 ¶ 2 n.1.

with evidence supporting its original damages theory.[139] Based on this, VH5 had to change its damages theory on, essentially, the eve of trial.[140] In addition, VH5 filed a motion to extend the deadline for expert discovery in May, which this Court granted.[141] Despite obtaining such an extension, VH5 failed to obtain an expert and presented no expert testimony at trial in support of its new damages theory.[142]

Third and finally, on the Friday before the week of trial, VH5 filed an "Emergency Motion to Adjourn Trial."[143] In that motion, VH5's counsel claimed that Rabe had withheld "key documents" and was engaging in "trial by ambush."[144] But in fact the basis for VH5's need to adjourn trial was not any concealment by Rabe and his counsel but rather VH5's and its counsel's failure to prosecute their case in a diligent manner.[145]

Taken together, the facts revealed at trial and the litigation tactics pursued by VH5 and its counsel give me serious concerns that much of this litigation was a calculated attempt to continue Felsher's pressure campaign on Rabe.

## II. ANALYSIS

[139] Dkt. 105 ("Pre-Trial T/C") at 6:21-7:10, 11:6-21.

[140] Id.

[141] Dkt. 53; Dkt. 56.

[142] Dkt. 92 at 9:12-14.

[143] Dkt. 85.

[144] Id. ¶¶ 2-4.

[145] Dkt. 92 at 3:4-4:1 ("THE COURT: . . . If I wanted to make sure that I had a complete production of documents, and I had a concern that a party wasn't, for whatever reason, going to produce, I would aggressively follow up and engage in meet-and-confer processes and go through the production. I'd serve subpoenas on third parties. If I was trying to get email from someone at a company and at an investment bank, I would seek the discovery from both the company and the investment bank to ensure I got a complete production. That is all standard. Here, there were no subpoenas. There was no effort, seemingly, to seek discovery from any third parties. The questions plaintiff has raised for the first time today are all questions that would be great questions for the plaintiff to have asked in a meet-and-confer discussion and, frankly, would have been fairly standard questions to ask in a meet-and-confer discussion. But these are not questions that a party gets to raise, absent truly extraordinary circumstances, just days before trial, long after the close of the discovery cutoff.").

This is superficially a claim for [*28] breach of contract and breach of the implied covenant by one member of an LLC against another. But as the facts and procedural history show, this litigation is more accurately viewed as retaliation by Felsher against Rabe for Felsher's termination from Aimia. There also appears to be some background machinations by Felsher and potentially others to pressure Rabe in connection with his ongoing lawsuit against Aimia in Canada. I highlight these considerations at the outset because there is no other reason to understand why VH5 and Hill would engage in years of litigation over an essentially valueless entity like OPL.

With that said, Rabe did breach the Operating Agreement when he dissolved OPL. Rabe's breach of the Operating Agreement was consistent with a long history by both Rabe and Hill not observing any of the corporate formalities that this Court expects of individuals operating a Delaware entity. But while Rabe is liable for breach of contract, VH5 has failed to make any showing that it suffered damages and so is entitled to only nominal damages.

Rabe has also sought fee shifting for alleged bad faith litigation tactics by VH5. I have spent much of this memorandum opinion highlighting [*29] certain aspects of VH5's and Hill's behavior in this litigation that have given me pause. Furthermore, I have concerns that VH5 and Hill have used this Court and its limited judicial resources as a tool for the untoward desire of harming Rabe's personal and professional life rather than seeking any sort of redress for harm. To be frank, I find that it is a close call as to whether fee-shifting is appropriate here considering this behavior. Nonetheless, VH5 has succeeded on its breach of contract claim, though it is entitled to only nominal damages. I am therefore unable to find that Rabe is entitled to the extraordinary remedy of fee-shifting.

## A. VH5 Has Proven That Rabe Breached The Operating Agreement

In Count II of the Amended Complaint, VH5 claims that Rabe breached the Operating Agreement by transferring OPL's assets and dissolving OPL. As explained below, even though VH5 appears to have been a nominal member of OPL standing in for Felsher, it was nonetheless a member entitled to enforce the Operating Agreement. VH5 has proven by a preponderance of the evidence that Rabe breached the Operating Agreement when he dissolved OPL. VH5 has

failed to meet its burden to prove that Rabe **[\*30]** transferred any assets of OPL.

To evaluate VH5's breach of contract, the court must interpret the Operating Agreement. "When engaging in that inquiry, the court 'applies the same principles that are used when construing and interpreting other contracts.'"[146] "When interpreting a contract, the role of a court is to effectuate the parties' intent."[147] The party seeking enforcement of a contract "bears the burden to prove his breach of contract claim by a preponderance of the evidence."[148] "Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[149]

### VH5 Has Standing To Sue For Breach Of Contract

Rabe does not dispute that the Operating Agreement was an enforceable contract. Rather, Rabe argues that VH5 was not a party to the Operating Agreement because Felsher, not VH5, made the initial capital contribution.[150] Rabe contends that, on this basis alone, VH5 was not a member and has no standing to sue for breach of contract.[151]

As already noted, it appears that VH5 served merely as a stand-in for Felsher and that the parties intended that Felsher would take over VH5's membership **[\*31]** interest once he was no longer conflicted through his position at Deutsche Bank. Furthermore, I find it concerning that Hill, an attorney, seemingly orchestrated VH5's role in OPL using an LLC agreement drafted by Hill, and Rabe, a non-attorney, was not represented by legal counsel or advised by Hill to obtain counsel.

---

[146] **_XRI Inv. Hldgs. LLC v. Holifield, 283 A.3d 581, 611 (Del. Ch. 2022)_** (quoting _Godden v. Franco, 2018 Del. Ch. LEXIS 283, 2018 WL 3998431, at \*8 (Del. Ch. Aug. 21, 2018)_).

[147] _Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006)_.

[148] _Zimmerman v. Crothall, 62 A.3d 676, 691 (Del. Ch. 2013)_.

[149] _H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. 2003)_.

[150] Dkt. 97 ("Def.'s OB") at 36; Dkt. 100 ("Def.'s AB") at 31-34.

[151] Def.'s OB at 36; Def.'s AB at 31-34.

Nonetheless, Rabe's argument is belied by the fact that VH5 was listed as a member in the Operating Agreement and that VH5 was a signatory to the Operating Agreement. Furthermore, it is hard to square Rabe's current argument with OPL's 2018 tax return, prepared at Rabe's direction, which listed VH5 as a member and identified VH5 and Hill as OPL's tax matters partners. Thus, though the parties apparently intended that Felsher would eventually replace VH5, it is nonetheless the case that VH5 was a member of OPL and has standing to sue for breach of the Operating Agreement.

### VH5 Has Not Proven That Rabe Transferred Any Of OPL's Assets In Breach Of The Operating Agreement

VH5 contends that Rabe breached the Operating Agreement by transferring the following "assets" to OPL Singapore: (a) OPL's business relationships and consulting contracts; (b) the Market Report prepared by **[\*32]** Rabe; and (c) OPL's website login information.[152] VH5 argues that Rabe did not receive either Board approval or VH5's consent to transfer any of these assets and, as such, Rabe breached the Operating Agreement.[153] As explained below, VH5 has failed to meet its burden that Rabe transferred any of OPL's assets in breach of the Operating Agreement.

### a. VH5 Fails To Prove That Rabe Transferred OPL's Business Relationships And Consulting Agreements To OPL Singapore

After Rabe started his role at Aimia and ceased his involvement with OPL, de Boer, through OPL Singapore, continued to do work for Hawaiian Airlines and Enjoy. VH5 argues that Rabe essentially transferred these business relationships to de Boer and OPL Singapore without any consideration.[154] VH5 further argues that Rabe transferred the contracts between OPL and its consultants to OPL Singapore without consideration.[155] Finally, VH5 contends that there was an existing "pipeline" of potential OPL clients that Rabe transferred to OPL Singapore, again without

---

[152] Pl.'s OB at 36-39.

[153] _Id._ at 39-42.

[154] Pl.'s OB at 37.

[155] _Id._ at 37-38.

consideration.[156]

VH5 has failed to prove by a preponderance of the evidence that any of these "assets" were transferred to de Boer. Concerning OPL's relationships with Hawaiian Airlines **[*33]** and Enjoy, VH5's sole basis for arguing that "OPL continued to do work for" these companies is that the OPL bank account continued to receive payments from these companies between June and October 2018.[157] During that period, OPL received payments from Hawaiian Airlines and Enjoy and then paid consultants, including de Boer, for the work they performed for these contracts.[158]

But a review of OPL's bank account statements and related invoices shows that the funds received and paid out by OPL during that period concerned work that OPL had performed during Spring 2018 when Rabe was still running OPL. Furthermore, OPL's business model was not particularly profitable, so it earned a minimal amount of gross profit from these contracts.[159] VH5 has not claimed that the payments made to these independent consultants were improper. Furthermore, VH5 has not claimed that the cash that remained in OPL's bank account was transferred to OPL Singapore. Thus, VH5 has failed to put forward any evidence that OPL's relationships with Hawaiian and Enjoy, or the money earned from these relationships, was ever transferred to OPL Singapore.

VH5's claims regarding the consulting contracts and "pipeline" are even thinner **[*34]** reeds that break upon minimal scrutiny. Concerning the consulting contracts, VH5's entire argument is premised on the exclusivity provisions contained in those contracts.[160] But VH5 has put forth no evidence that these consulting contracts were transferred or assigned to OPL Singapore, and Rabe explicitly denied sending the consulting contracts to de Boer.[161] Thus, VH5 has failed to prove by a

preponderance of the evidence that these consulting contracts were ever transferred to OPL Singapore.[162]

Finally, concerning OPL's "pipeline" of work with Singapore Airlines, Aegean Airlines, and Kenya Airways, VH5 focuses on a handful of emails on which Rabe was either copied or minimally involved and Rabe's email to Aimia in May 2018 where he noted this purported "pipeline" of clients.[163] But VH5 has failed to put forward any proof that OPL had any contracts with these entities. Furthermore, VH5 has not offered any evidence that OPL ever received any revenue from these companies. In addition, to the extent Rabe referenced these potential clients to Aimia, his statements are better viewed as optimistic self-promotion intended to assist Rabe in negotiating his compensation package.[164] VH5 has failed to prove **[*35]** that there were any existing OPL relationships with these companies that could have been transferred by Rabe in the first place.

### b. VH5 Fails To Prove That Rabe Transferred The Market Report To OPL Singapore

VH5's arguments concerning the Market Report are, frankly, challenging to comprehend. It appears that the crux of its argument is that OPL Singapore issued an updated version of the Market Report in 2020 that bore similarities to the Market Report prepared in 2017.[165] However, as established at trial, de Boer played a role in drafting the Market Report in 2017 and was himself an experienced consultant in the airline loyalty industry.[166] Thus, de Boer would appear to have been

---

[156] *Id.* at 37.

[157] *Id.*

[158] JX 54.

[159] OPL's bank account statements reflect that OPL received payments from Enjoy and Hawaiian totaling $147,448 and paid its independent consultants a total of $139,754, resulting in a gross profit to OPL of $7,694. This amount does not include any other expenses that OPL may have incurred.

[160] Pl.'s OB at 37.

[161] TT338:13-20 (Rabe).

[162] I also find it relevant that the consulting contracts could be terminated by either party for any reason on thirty-days' notice, which significantly diminishes any bite the exclusivity provision contained in those contacts may have had.

[163] Dkt. 101 ("Pl.'s AB") at 11-12.

[164] And even then, these statements are most generously interpreted as optimistic projections for a company that had been in existence for only a few months, obtained only one client, and failed to turn any profit. As a valuation metric, these statements do not support anything meaningful.

[165] Pl.'s AB at 13-14.

[166] *See, e.g.,* TT270:4-14 (Rabe) ("Q: You took the lead in drafting the report; right? A: I was the lead drafter, yeah. Q: You had others help you with the report? A: That's correct. Q: With the research? A: That's correct, and drafting, yeah. Q: And drafting. And that would be Evert de Boer; right? A:

sufficiently capable to create a new version of the Market Report in 2020. In addition, VH5 has not put forth any evidence that the original Market Report was ever transferred to de Boer (or what that would even mean, since the Market Report was publicly available). Therefore, VH5's argument that Rabe transferred the Market Report to OPL Singapore fails.

### c. Rabe Was Free To Transfer The Website Since It Was His Property

Finally, VH5 argues that Rabe transferred the website to OPL Singapore for no consideration. **[*36]** [167] VH5's argument on this point takes up all of two sentences in its post-trial briefing.[168] At trial, it was clearly established that Rabe created the OPL website before OPL was ever officially formed.[169] VH5 has put forward no evidence that Rabe ever transferred the website to OPL after its formation. VH5 has not argued that the Operating Agreement otherwise restricted Rabe from transferring this website, which was his own personal property. Thus, VH5 has failed to meet its burden to prove that Rabe was not authorized to transfer the website to OPL Singapore.

### Rabe Breached The Operating Agreement By Cancelling OPL

VH5 argues that Rabe's cancellation of OPL breached three separate provisions of the Operating Agreement.[170] First, VH5 argues that Rabe breached Section 9.2 of the Operating Agreement by "dissolv[ing], wind[ing] up and liquidat[ing] the Company" without Board approval.[171] Second, VH5 argues that Rabe breached Section 9.3 of the Operating Agreement by failing to provide a "Notice of Dissolution" to VH5 or otherwise informing VH5 of OPL's dissolution.[172] Third, VH5 contends that Rabe breached Section 9.4 of the Operating Agreement by failing to (a) obtain a statement

from a CPA setting forth **[*37]** OPL's assets and liabilities on the date of dissolution and (b) determine the fair market value of OPL's assets.[173]

In response, Rabe argues that, as the only Class A Member of OPL, he had authority to unilaterally remove Hill as a Director.[174] Rabe contends that, "after consultation with legal counsel, he acted as sole Class A Member and a one-member Board in taking the actions he took with regard to winding up and dissolving OPL."[175] Rabe further argues that Hill was not a valid Board member and, as such, Rabe had a right to take these actions as the functional Board.[176] Concerning VH5's contention that Rabe failed to provide a "Notice of Dissolution," Rabe argues that his email in May 2018 that he was shutting down OPL provided such notice (even though OPL was not formally shut down until almost a year later).[177] Finally, Rabe argues that OPL's 2018 year-end financial statements provided to Hill satisfied Section 9.4 since OPL was inactive for the entirety of 2019 until its dissolution.[178]

Determining whether Rabe in fact breached the Operating Agreement is challenging because at no point did either Rabe or Hill observe any of the typical formalities in operating OPL that this **[*38]** Court expects. For example, a third member of the Board was never appointed, even though Section 4.2 of the Operating Agreement requires that the Board be composed of three Directors, including "one Director mutually agreed upon by the Class A and Class B Members."[179] Furthermore, the OPL Board never held a single meeting. Hill arguably faces greater blame for the failure to observe corporate formalities, given that he is a lawyer, he drafted the Operating Agreement, and he claimed that he was the part-time general counsel of OPL.[180]

---

Yes.").

[167] Pl.'s OB at 38.

[168] *Id.*

[169] TT189:8-190:8 (Rabe); Ex. 1 to JX 83.

[170] Pl.'s OB at 45-47.

[171] *Id.* at 45.

[172] *Id.* at 46.

---

[173] *Id.*

[174] Def.'s OB at 37.

[175] *Id.* at 37-38.

[176] *Id.* at 38.

[177] *Id.*

[178] *Id.*

[179] Operating Agreement § 4.2.

[180] I note that, at trial, Hill tried to portray himself as a relatively sophisticated attorney experienced with advising start-up entities and, at the same time, an unsuspecting rube who was

Nonetheless, Delaware is a pro-contractarian state, and "Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties."[181] Rabe has not argued that there is some other consideration that should override this fundamental public policy here.

Rather, Rabe contends that he complied with the Operating Agreement by taking actions as a one-member Board and that he was authorized to do so. A review of the relevant provisions of the Operating Agreement shows that he was not so authorized. Rabe's conclusory statement that Hill was not a "valid" member of the Board is not supported by the Operating [*39] Agreement, which expressly lists Hill as a Director.[182] As outlined below, Rabe had the authority to remove Hill as a Director. With that said, Rabe produced no evidence that he removed Hill from the Board or followed the prescribed procedures for dissolving OPL. Given this, Rabe breached the Operating Agreement when he dissolved OPL.

### a. The Operating Agreement Is Ambiguous As To When A Director May Be Removed

The Operating Agreement is ambiguous as to whether Rabe, as the sole Class A Member, had authority to unilaterally remove Hill as a Director and reduce the size of the Board. "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two different meanings."[183] "By contrast a contract is unambiguous when 'the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation.'"[184]

Looking to the Operating Agreement, Section 4.8 states that a Director may be removed from the Board without cause by resolution of all the members (*i.e.*, both Class

A and Class B Members).[185] However, Sections 6.2 and 6.3 state that the Class A Members, acting alone, may remove any Director and reduce [*40] the size of the Board.[186] These provisions are in conflict and have two different meanings. Thus, the Operating Agreement is ambiguous on the questions of whether Rabe, as the sole Class A Member, had the authority to remove Hill as a Director and reduce the size of the Board.

### b. Application Of The Rule Of *Contra Proferentem* Is Appropriate In Interpreting The Operating Agreement's Ambiguous Provisions

"Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'"[187] "[T]he rule of *contra proferentem* is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction."[188] "Nevertheless, resort to the rule is appropriate 'in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position[.]"[189] Under the rule of *contra proferentem*, this Court will "constru[e] the ambiguous contract terms against the drafter[.]"[190]

---

taken advantage of by Rabe. Not surprisingly, Hill's testimony lacked credibility.

[181] *NACCO Indus., Inc. v. Applica Inc., 997 A.2d 1, 35 (Del. Ch. 2009).*

[182] Operating Agreement § 4.2.

[183] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992).*

[184] ***Florida Chem. Co., LLC v. Flotek Indus., Inc., 262 A.3d 1066, 1080 (Del. Ch. 2021).***

[185] *See* Operating Agreement § 4.8 ("Any Director may be removed from the Board with or without cause by the resolution of the Members acting at a meeting through written consent in accordance with the terms of this Agreement.").

[186] *See id.* § 6.2 ("The Class A Members shall have the approval and consent rights as described in this Agreement and as provided for members under the Act and the Class A Members shall have the right to elect and remove any Director at a meeting called for such purpose."); *id.* § 6.3 ("The following actions and decisions require, or may be taken or made by, Approval of the Class A Members: (1) Election and removal of directors of, or increasing or decreasing the size of, the Board, pursuant to Section 4.2; . . . (4) Expulsion or removal of a Director, pursuant to Section 4.8[.]").

[187] *Salamone v. Gorman, 106 A.3d 354, 369 (Del. 2014)* (quoting *GMG Capital Inv., LLC v. Athenian Venture P'rs I, L.P., 36 A.3d 776, 780 (Del. 2012)*).

[188] *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del. 1985).*

[189] *Zimmerman v. Crothall, 62 A.3d 676, 698 (Del. 2013).*

[190] *Id.*; *see also* **RESTATEMENT (SECOND) OF CONTRACTS § 206** ("In choosing among the reasonable

VH5 argues that I should apply the rule of contractual interpretation that the "specific" language of Section 4.8 should control over the "general" language of Sections [*41] 6.2 and 6.3.[191] However, this is not a case where the "specific/general" rule of contractual interpretation is applicable—it cannot be said that the language in Section 4.8 is more specific than that in Sections 6.2 and 6.3. Rather, they deal with the exact same issue and are in direct conflict.

Given the unique circumstances of this case, I conclude that application of the rule of *contra proferentem* is appropriate.[192] Here, Hill, a lawyer, was an interested party in the transaction through his ownership of VH5 and also drafted the Operating Agreement. In contrast, Rabe, a non-lawyer, was not represented by counsel and, based on testimony at trial and the evidence submitted, did not attempt to negotiate any of the Operating Agreement's provisions. Further adding to the unique nature of this dispute, VH5 was apparently acting merely as a stand-in investor for Felsher, a long-time client and close friend of Hill. Given these considerations, it is likely that Hill "provide[d] more carefully for the protection of his [and Felsher's] own interests than for those of the other party" and that he was "more likely than the other party to have reason to know of uncertainties of meaning."[193]

Applying [*42] the rule of *contra proferentem*, I conclude that Rabe, as the sole Class A Member, had the power to remove Hill as a Director and to reduce the size of the Board.

---

meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

[191] Pl.'s AB at 17; *see also DCV Hldgs., Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005)* ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[192] Even if I were to adopt VH5's interpretation of the Operating Agreement and conclude that Rabe did not have the power to unilaterally remove Hill as a director and reduce the size of the Board, this interpretation would not be dispositive as I ultimately conclude that Rabe did not follow the requisite steps to take these actions. Thus, under either interpretation of the Operating Agreement, VH5 would succeed on its breach of contract claim.

[193] *RESTATEMENT (SECOND) CONTRACTS § 206*.

### c. Assuming Rabe Had The Power To Remove Hill, Rabe Put Forward No Evidence That He Actually Did So And Thus Breached The Operating Agreement When He Dissolved OPL

Rabe contends that "after consultation with legal counsel, he acted as sole Class A Member and a one-member Board in taking the actions he took with regard to winding up and dissolving OPL."[194] The problem with Rabe's argument is that there is no documentary evidence that he took these actions—all that has been put forth in support of this argument is Rabe's testimony.[195] Indeed, Rabe acknowledged at trial that there was no written Board resolution or written consent reflecting these actions.[196]

As noted, Rabe and Hill never observed any sort of formalities in operating OPL. But these past failures to adhere to corporate formalities did not give Rabe license to ignore corporate formalities in the future. This is particularly the case in taking extraordinary actions like removing a director and dissolving the entity. Having held trial on this topic, it appears that it is far [*43] more likely that Rabe did not formally "resolve" to take any of these actions. Rather, it seems that Rabe viewed OPL as an entity that had no value, opted to dissolve it since it was more trouble than it was worth, and did not observe any formalities in doing so.

As I will explain in more detail below, Rabe is correct that OPL had no value. With that said, the pro-contractarian public policy of Delaware demands that Rabe comply with the Operating Agreement in taking the actions he took in dissolving OPL. His failure to do so constitutes a breach of the Operating Agreement.

### d. Rabe Further Breached The Operating Agreement By Failing To Provide Notice Or An Accounting To VH5 Upon OPL's Dissolution

Section 9.3 of the Operating Agreement requires that the person winding up OPL provide notice to all members.[197] Section 9.4 requires, among other things, that each member of OPL be provided with a statement prepared by a CPA setting forth the assets and liabilities

---

[194] Def.'s OB at 37-38.

[195] TT250:22-251:5, 352:6-19 (Rabe).

[196] TT352:6-354:5 (Rabe).

[197] Operating Agreement § 9.3.

of OPL as of the date of dissolution.[198] VH5 argues that Rabe failed to either provide notice or a statement of assets and liabilities.[199]

Concerning notice, Rabe argues that the email he sent in May 2018 provided such notice.[200] However, the **[*44]** email relied upon by Rabe does not constitute effective notice for two reasons. First, this email was sent almost one year prior to Rabe dissolving OPL. Second, and more significantly, the email is equivocal as to whether Rabe planned to shut down OPL. Rabe wrote to Hill that "[i]n speaking with Evert we were thinking it might be easier to just close down [OPL] and have him start a new company with the same name in another jurisdiction."[201] Rabe then asked Hill to "pause the elaboration of the transfer agreement" originally requested by Rabe.[202] A statement that it "might be easier," combined with Rabe's request that Hill "pause" working on an agreement to transfer Rabe's interest in OPL, is not an unequivocal notice to VH5 that Rabe was dissolving OPL. Thus, this email does not satisfy the notice requirement under Section 9.3.

Concerning Section 9.4's requirement, Rabe argues that the 2018 year-end financial statements that Rabe provided Hill on March 4, 2019, satisfied this requirement.[203] Section 9.4 clearly requires that the CPA-prepared financial statements be as of the date of dissolution.[204] Rabe argues that complying with this formality was not necessary since OPL was not active in 2019 **[*45]** and there were no changes to assets and liabilities between the 2018 year-end financial statements and the date of dissolution.[205] While it may

be the case that there were no changes in the financial statements, adopting Rabe's argument here would directly contravene the clear requirement set forth in Section 9.4. Therefore, Rabe's failure to provide VH5 with CPA-prepared financial statements as of the date of dissolution breached the Operating Agreement.

### Rabe's Affirmative Defenses Of Waiver And Estoppel Fail

Rabe asserts two affirmative defenses to VH5's breach of contract claim: waiver and estoppel by acquiescence.[206] The party asserting an affirmative defense of waiver or estoppel by acquiescence bears the burden of proving the defense by a preponderance of the evidence.[207]

Concerning waiver, "[i]t is well settled in Delaware that contractual requirements or conditions may be waived."[208] Delaware's standard for proving waiver is 'quite exacting.'[209] "Waiver is the voluntary and intentional relinquishment of a known right."[210] "It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights."[211]

"Unlike waiver, **[*46]** 'estoppel depends on what a party caused another to do, and involves an element of reliance.'"[212] "Estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might perhaps have otherwise existed, as against another person, who has

---

[198] Id. § 9.4. Section 9.4 also requires that, "[t]o the extent that the Members determine that any or all of the assets of the Company shall be sold in liquidation, the Liquidating Trustee, as promptly as possible, shall determine the Fair Market Value of the assets and such assets shall be sold[.]" VH5 alleges that Rabe failed to comply with this requirement. Pl.'s OB at 46. However, OPL had no value and no assets at liquidation, so there were no assets to be sold.

[199] Pl.'s OB at 46-47.

[200] Def.'s OB at 38.

[201] JX 51.

[202] Id.

[203] Def.'s OB at 38; see also JX 62; JX 67.

[204] Operating Agreement § 9.4.

[205] Def.'s OB at 38.

[206] VH5 has not argued that Rabe's affirmative defenses cannot be asserted against VH5's claims. I ultimately conclude that Rabe has failed to prove his affirmative defenses. Thus, I need not reach the question of whether these affirmative defenses are available as a matter of law.

[207] In re Coinmint, LLC, 261 A.3d 867, 894-95 (Del. Ch. 2021).

[208] AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc., 871 A.2d 428, 444 (Del. 2005).

[209] Coinmint, 261 A.3d at 893.

[210] AeroGlobal, 871 A.2d at 444.

[211] Id.

[212] Coinmint, 261 A.3d at 894 (quoting Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs., Inc., 2010 Del. Ch. LEXIS 247, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010)).

in good faith relied upon such conduct, and has been led thereby to change his position for the worse."[213]

"The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."[214] VH5 will be deemed to have acquiesced where it:

> has full knowledge of [its] rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[215]

"The party invoking the defense of acquiescence must prove that the party asserting the claim 'by words or deed, has acknowledged **[*47]** the legitimacy of the defendants' conduct.'"[216] "The defense of acquiescence turns on the objective manifestations of the plaintiff's conduct."[217] "For the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice."[218]

Rabe argues that his email exchanges and phone conversations with Hill in May 2018 support his defense of either waiver or estoppel by acquiescence.[219] Rabe argues that during the May 8 phone call "Hill assented to the transfer of OPL for no consideration" and that

---

[213] *Kahn v. Household Acq. Corp., 591 A.2d 166, 176 (Del. 1991)* (alterations and internal quotation marks omitted) (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 804, at 189 (1941)).

[214] *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc., 2014 Del. Ch. LEXIS 28, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014).*

[215] *Klaassen v. Allegro Dev. Corp., 106 A.3d 1035, 1047 (Del. 2014).*

[216] *XRI Inv. Hldgs. LLC v. Holifield, 283 A.3d 581, 623 (Del. Ch. 2022)* (quoting *Clements v. Rogers, 790 A.2d 1222, 1238 n.46 (Del. Ch. 2001)*).

[217] *Id.*

[218] *Klaassen, 106 A.3d at 1047* (footnote omitted).

[219] Def.'s OB at 47-49.

---

Rabe made clear on May 24, 2018, Rabe's "chosen path to shut down OPL."[220] Rabe notes that Hill, as an attorney and the professed part-time general counsel of OPL, was well aware of his rights under the Operating Agreement but did not provide any warning that he objected to Rabe's plans.[221] Rabe also points to his January 2019 exchange with Hill where he stated that "the company has not been active" since May 2018 and that they "should discuss what the future plan should be for [OPL]."[222]

These communications between Rabe and Hill do not support Rabe's affirmative defenses. As noted, the standard for proving waiver is exacting. All that Rabe **[*48]** has put forth in support of his waiver defense is that Hill agreed to draft a sale agreement and that OPL had little to no operations during the bulk of 2018 through 2019. None of the statements by Hill support the conclusion that he "voluntarily and intentionally relinquished" his rights under the Operating Agreement related to the dissolution of OPL.

Concerning estoppel by acquiescence, the statements relied upon by Rabe are insufficient to support the conclusion that Hill, either by word or deed, acknowledged the legitimacy of Rabe's conduct. Despite Rabe's insistence, Hill's agreement to prepare a sale agreement that would transfer *Rabe*'s interest in OPL for little or no consideration does not represent an acknowledgment by Hill that Rabe could dissolve OPL. Rabe further argues that Hill's silence between May 2018 and January 2019, after Rabe had told Hill that his plan for OPL had changed to a dissolution, supports Rabe's defense of acquiescence. But this argument fails to account for the fact that Rabe did not actually dissolve OPL until April 2019. Between January 2019 and April 2019, Hill sent Rabe several emails, none of which could be interpreted as acquiescing to dissolution **[*49]** of OPL.

Therefore, in light of these considerations, Rabe has failed to meet his burden to prove either of his affirmative defenses by a preponderance of the evidence.

## VH5 Fails To Prove Damages

---

[220] *Id.* at 48.

[221] *Id.*

[222] *Id.* (citing JX 61).

"A plaintiff bears the burden of proving damages by a preponderance of the evidence."[223] "The law does not require certainty in the award of damages where a wrong has been proven and injury established."[224] "Nevertheless, when acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove damages.'"[225]

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages."[226] "Nominal damages are 'not given as an equivalent for the wrong, but rather merely in recognition of a technical injury by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the plaintiff's rights and the commission of a wrong.'"[227]

VH5's original damages theory was based on Rabe's alleged transfer of OPL's assets to OPL Singapore and de Boer.[228] But to the extent OPL **[*50]** had any assets at the time that de Boer created OPL Singapore, none of OPL's assets were transferred to OPL Singapore.[229] Apparently VH5 recognized that this was a flawed theory of damages, since it acknowledged during the pre-trial conference that it was unable to come up with evidence supporting its original theory.[230]

_____

[223] _Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc., 2021 Del. Ch. LEXIS 77, 2021 WL 1592473, at *10 (Del. Ch. Apr. 23, 2021)._

[224] _Del. Exp. Shuttle, Inc. v. Older, 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)._

[225] _eCOMMERCE Indus. Inc. v. MWA Intelligence, Inc., 2013 Del. Ch. LEXIS 245, 2013 WL 5621678, at *42 (Del. Ch. Sept. 30, 2013)_ (quoting _Medek v. Medek, 2009 Del. Ch. LEXIS 120, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)_).

[226] _Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC, 2009 Del. Ch. LEXIS 55, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009)._

[227] _Id._ (quoting _Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC, 2005 Del. Ch. LEXIS 199, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005)_).

[228] Dkt. 64 at 13-15.

[229] _See supra_ Section II.A.2.

[230] Pre-Trial T/C at 6:21-7:10.

During the pre-trial teleconference, VH5's counsel attributed this to its inability to obtain documents from de Boer.[231] But after pressing VH5's counsel during this teleconference, it became clear that VH5's counsel never subpoenaed de Boer and did not even try to obtain these documents until shortly before trial was to begin, well after the cutoff date for fact discovery.[232] VH5's counsel was unable to provide any satisfactory reason for its intransigence in seeking these documents.[233]

So, less than a month before trial, VH5 switched its entire damages theory and now argues that at least some portion of Rabe's Can$1 million signing bonus was intended to compensate Rabe for his interest in OPL.[234] VH5 has cited no law in support of the

_____

[231] _Id._ at 11:6-12 ("[PLAINTIFF'S COUNSEL]: That's correct Your Honor. I mean, the person who is not — who is not present in this proceeding is [ ] de Boer, who is the gentleman in Singapore who is an OPL consultant and to whom Rabe transferred the business. It was our understanding that he would be providing us with information, and all of a sudden he did not.").

[232] _Id._ at 13:3-7 ("THE COURT: When did you first request these documents [concerning OPL Singapore]? [PLAINTIFF'S COUNSEL]: I believe I did that in my letter that's attached to the motion. I believe it's August 1st."); _id._ at 19:13-23 ("[DEFENDANT'S COUNSEL]: . . . I should point out that this case was originally supposed to go to trial in September of 2021, so really, the case began back in April of 2020, and at that time, up until the fact discovery deadline, the plaintiff, as you were exploring with [Plaintiff's counsel], did not seek a subpoena to get documents from Aimia or from Mr. Mittleman or take their depositions. It should be noted that they also did not seek to subpoena Mr. de Boer or obtain documents from Mr. de Boer.").

[233] _Id._ at 13:8-24 ("THE COURT: Why the delay [in seeking documents from de Boer]? [PLAINTIFF'S COUNSEL]: Well, I mean — well, I mean, Your Honor, I think the — you know, with respect to the expert issues, you know — I mean, these documents — these documents or these documents, or these deposition transcripts, they effectively go to damages, okay. So it's a — it's a damages theory based on the view that Rabe divested his interest in OPL in exchange for the signing bonus. It's you know — I would say in terms of — I mean, could they have been requested sooner? I suppose that's correct. But like I said, our damages theory was different than it is now. And it's been the — you know, it's been the inability to obtain that information from Singapore that pushed us in this direction and necessitated this request.").

[234] Pl.'s OB at 49-51.

proposition that I may use Rabe's signing bonus to join as CEO of Aimia as a proxy for calculating the value of OPL. VH5 put forward **[*51]** no expert to support either this proposition or to put forward a valuation of OPL. VH5 does not even suggest what portion of Rabe's signing bonus should be attributed to OPL.[235]

At bottom, VH5 failed to prove by a preponderance of the evidence that OPL had any value. And, to be clear, this was not a close call. OPL was an operating company for less than six months. Furthermore, it was a consulting company where all value was attributable to Rabe and the other consultants brought in by Rabe. The minimal evidence presented at trial left me convinced that, the second Rabe stepped away from OPL to join Aimia, whatever small value OPL might otherwise have had was eliminated.

VH5's reliance on Rabe's email with Phil Mittleman where Rabe touts the purported success of OPL is misguided. This email exchange was in the context of Rabe negotiating to obtain the highest compensation possible. And as noted, Rabe's comments about the purported success of OPL is better viewed as optimistic self-promotion. Furthermore, to the extent VH5 thinks Phil Mittleman's comment that Aimia could do an "acquihire" and obtain both Rabe and OPL, it is undisputed that Aimia never acquired OPL. VH5 is unable to account **[*52]** for this fact in its theory of damages.[236] In addition, Rabe's Can$1 million signing bonus is attributable to two far more concrete items: (1) the millions of dollars of LifeMiles options that, it is undisputed, everyone assumed Rabe would need to forfeit if he joined Aimia and (2) Aimia's desire to induce Rabe to join as CEO.[237]

---

[235] VH5 also failed to take even the simple step of converting the signing bonus to U.S. dollars, so that is not in the record.

[236] I pause to highlight my concern that Phil Mittleman's deposition testimony concerning OPL was influenced by Rabe's litigation against Aimia in Canada, given Mittleman Brothers' significant financial interest in Aimia. VH5 failed to arrange to have Phil Mittleman testify in person for this litigation, where he would have been subject to cross-examination. And, compounding issues with VH5's reliance on Phil Mittleman's deposition testimony, he was not involved in the final negotiation of Rabe's compensation package. Even setting aside any evidentiary issues, which the parties have not raised, I still do not rely on Phil Mittleman's account of events for purposes of this decision.

[237] *See, e.g.,* SX 19 ("The initial equity grant [and] buyout of [OPL] needs to offset losing these [LifeMiles] options and

In short, VH5 has failed to meet its burden to prove damages. With that said, VH5 has shown that Rabe breached the Operating Agreement when he dissolved OPL without Hill's or VH5's consent. VH5 is therefore entitled to nominal damages of one dollar. This result is all the more appropriate considering OPL had little to no value anyway.

### VH5 Is Not Entitled To A "Do-Over" In Proving Damages

VH5 argues that in the event I conclude that it has failed to meet its burden in proving damages, then it should be granted leave to obtain financial information from de Boer on the present value of OPL's business.[238] I have devoted significant passages of this memorandum opinion to highlighting VH5's intransigence in prosecuting this case, including its failure even to attempt to compel the production of OPL Singapore's financial records until the month of trial. VH5 is not **[*53]** entitled to a "do-over" now, well after the close of trial. Thus, to the extent VH5's argument on this point should be interpreted as a motion to reopen the case so that it may continue its efforts to divine the value of a valueless company, the motion is denied. Also, given my stated concerns that VH5 brought and maintained this litigation as leverage over Rabe, continued litigation would be inequitable.

### B. VH5's Implied Covenant Claim Is Duplicative Of Its Breach Of Contract Claim And Thus Fails

The implied covenant is "a limited and extraordinary remedy" and "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected

---

create some immediate liquidity."). Furthermore, Section 4.7 of the Operating Agreement clearly provides that "[n]either the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other activities or the income or proceeds derived" from a Director's other business interests and activities. Operating Agreement § 4.7.

[238] Pl.'s OB at 51-53. VH5 does not cite to any Delaware caselaw supporting the proposition that I should reopen the factual record to allow it to prove damages after failing to meet its burden at trial. Rather, VH5 cites to a 1980 case from the Court of Appeals for the State of Washington, which does not constitute binding precedential authority. Pl.'s OB at 52 (quoting *Cerjance v. Kehres, 26 Wn. App. 436, 613 P.2d 192 (Wash. Ct. App. 1980)*).

one party to a contract."[239] "The implied covenant is inherent in all contracts and is used to confer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'"[240] "The implied covenant cannot be invoked to override the express terms of the contract."[241] "The party asserting the implied covenant has the burden of proving 'that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain [*54] that the asserting party reasonably expected.'"[242]

VH5's claim that Rabe breached the implied covenant is challenging to follow. VH5 appears to argue that Rabe's facilitation of "de Boer's take over [*sic*] OPL's business without objection is a breach of the implied covenant[.]"[243] Per VH5, "Rabe was the Executive Officer of OPL with general supervision and control over and responsibility for OPL's day-to-day operations" and "[h]e breached the implied covenant by facilitating de Boer's assumption and takeover of the [*sic*] OPL's business."[244]

In support of its position, the caselaw on which VH5 primarily relies is our Supreme Court's opinion in *Dieckman v. Regency GP LP*.[245] In *Dieckman*, the general partner of a publicly traded master limited partnership issued a proxy statement to induce unitholders to approve a conflicted transaction.[246] The general partner was not required to issue a proxy statement, but doing so allowed the general partner to claim the protections of a safe harbor contained in the limited partnership agreement that would have protected the merger from judicial review.[247] A unitholder claimed

_____

[239] *Nemec v. Shrader, 991 A.2d 1120, 1128 (Del. 2010)*.

[240] *Dieckman v. Regency GP LP, 155 A.3d 358, 367 (Del. 2017)* (quoting *Nemec, 991 A.2d at 1125 (Del. 2010)*).

[241] *Kuroda v. SPJS Hldgs., L.L.C., 971 A.2d 872, 888 (Del. 2009)*.

[242] *Baldwin v. New Wood Resources LLC, 283 A.3d 1099, 1118 (Del. 2022)*.

[243] Pl.'s OB at 42.

[244] *Id.* at 44.

[245] *Id.* at 43-44.

[246] *Dieckman, 155 A.3d at 367-68*.

[247] *Id.*

that the proxy statement contained false and misleading statements.[248] Our Supreme Court held that once [*55] the general partner went beyond the minimal disclosure requirements of the LP agreement and issued the detailed proxy statement, the implied covenant required that it not mislead unitholders.[249]

Per VH5, *Dieckman* is applicable here because "Rabe should not be able to subvert the Operating Agreement's protections against a sale or disposal of all of [*sic*] substantially all of OPL's assets by facilitating de Boer's assumption and takeover of OPL's business."[250] I struggle to see any connection between *Dieckman* and this dispute. VH5 has not claimed that Rabe somehow made false or misleading statements to induce VH5's consent to a supposedly improper transfer of OPL's assets. Indeed, Rabe expressly told Hill that he intended to transfer OPL to de Boer, and Hill did not voice any objection.

At bottom, VH5's implied covenant claim is duplicative of its breach of contract claim—VH5 essentially rehashes its argument that Rabe breached the Operating Agreement by allegedly transferring OPL's assets to OPL Singapore. But "[t]he implied covenant cannot be invoked to override the express terms of the contract."[251] Thus, VH5 has failed to prove by a preponderance of the evidence that Rabe breached the implied [*56] covenant.

## C. Rabe Is Not Entitled To Fee Shifting

Rabe seeks fee shifting, arguing that "[t]his case was brought by [VH5] in bad faith and is driven, not by any harm that VH5 claims that it suffered, but rather due to a personal grudge held by Felsher."[252] "Delaware operates by the American Rule, under which 'litigants are expected to bear their own costs of litigation.'"[253]

_____

[248] *Id. at 360*.

[249] *Id. at 368*.

[250] Pl.'s OB at 44.

[251] *Kuroda v. SPJS Hldgs., L.L.C., 971 A.2d 872, 888 (Del. 2009)*.

[252] Def.'s OB at 50.

[253] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc., 2020 Del. Ch. LEXIS 262, 2020 WL 4596838, at *4 (Del. Ch. Aug. 11, 2020)* (quoting *Beck v. Atl. Coast PLC, 868 A.2d 840, 850 (Del. Ch.*

One exception to this general rule is the bad faith exception:

> The bad faith exception to the American rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation. . . . The bad faith exception is not lightly invoked. The party seeking a fee award bears the stringent evidentiary burden of producing 'clear evidence' of bad-faith conduct.[254]

I have highlighted throughout this memorandum opinion many of my concerns with the behavior by VH5 and Hill in litigating this action.[255] As discussed, I found that much of Hill's trial testimony was not credible. I also noted my serious concerns with Hill's behavior in his interactions with Rabe given that Hill is an attorney. In addition, **[*57]** Rabe, in his post-trial briefing, set forth other troubling actions by VH5 and Hill over the course of this litigation.[256] Finally, I have grave reservations about whether Felsher, a non-party in this litigation, may have used this Court to put pressure on Rabe, either to exact personal revenge for Felsher's termination from Aimia, to create leverage in the parallel litigation in Canada, or both.

With that said, I cannot conclude that Rabe has produced clear evidence of bad faith such that the extraordinary remedy of fee shifting is warranted. Ultimately, Rabe did breach the Operating Agreement. While VH5 is entitled to only nominal damages, it has nonetheless prevailed on its breach of contract claim. Even considering the concerning tactics taken by VH5 and Hill throughout this litigation, I would be hard

pressed to find that VH5 has engaged in a level of bad faith that would warrant overriding the American Rule when it ultimately prevailed on its claim. Therefore, Rabe's request for fee shifting must be rejected.

## III. CONCLUSION

For the foregoing reasons, Count III of VH5's Complaint must be dismissed. VH5 is entitled to judgment in its favor on Count II and is **[*58]** awarded nominal damages in the amount of one dollar. The parties are directed to confer and submit a proposed form of final judgment within five business days.

---

**End of Document**

---

2005)]).

[254] *Beck, 868 A.2d at 850-51*.

[255] *See, e.g., supra* Section I.I.

[256] *See* Def.'s OB at 52-53 (discussing how Hill and VH5 initially denied ever receiving the May 2018 email exchange in VH5's sworn responses to Rabe's RFAs but later changed the denial to an "admitted"); *id.* at 53 (highlighting Hill's highly suspect claim during trial that he had become aware in 2019 "from reputable industry sources that OPL billed in excess of one million dollars" but refusing to identify these "reputable sources" or produce any documentation substantiating these claims); *id.* at 54 (noting that Hill refused to produce any emails, texts, or other correspondence from, to, or copying Felsher on the basis of attorney-client privilege, even though VH5 never produced a privilege log).